KLEPPE, SECRETARY OF THE INTERIOR, ET AL.
*v.* SIERRA CLUB ET AL.

No. 75–552.   Argued April 28, 1976—Decided June 28, 1976*

*Together with No. 75–561, *American Electric Power System et al.* v. *Sierra Club et al.,* also on certiorari to the same court.

392

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, Rehnquist, and Stevens, JJ., joined. Marshall, J., filed an opinion concurring in part and dissenting in part, in which Brennan, J., joined, *post*, p. 415.

*Deputy Solicitor General Randolph* argued the cause for petitioners in No. 75–552. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Taft, Raymond N. Zagone, Herbert Pittle,* and *Jacques B. Gelin. Francis M. Shea* argued the cause for petitioners in both cases. With him on the briefs were *Peter J. Nickles, Richard M. Merriman, Peyton G. Bowman III, James K. Mitchell, Henry B. Weaver, John E. Nolan, Jr., Richard H. Porter, Frank B. Friedman, Dale A. Wright, Harold L. Talisman, Richard T. Conway, David Booth Beers, Charles A. Case, Jr., David B. Ward, Robert L. Ackerly, Joseph S. Wager, Patrick J. McDonough, Max N. Edwards, James W. McDade,* and *George J. Miller.*

*Bruce J. Terris* argued the cause for respondents in both cases. With him on the briefs were *Suellen T. Keiner* and *Nathalie V. Black. John L. Warden* and *Jerome H. Simonds* filed a brief for Amax, Inc., respondent under this Court's Rule 21 (4).

*V. Frank Mendocino,* Attorney General, argued the cause for the State of Wyoming as *amicus curiae* by special leave of the Court. With him on the brief were

the Attorneys General and other officials for their respective States as follows: *William J. Baxley,* Attorney General of Alabama, and *Henry H. Caddell,* Assistant Attorney General, *Evelle J. Younger,* Attorney General of California, and *Nicholas C. Yost,* Deputy Attorney General, *J. D. MacFarlane,* Attorney General of Colorado, *Carl R. Ajello,* Attorney General of Connecticut, *Wayne L. Kidwell,* Attorney General of Idaho, *Richard C. Turner,* Attorney General of Iowa, *Francis B. Burch,* Attorney General of Maryland, *Henry R. Lord,* Deputy Attorney General, and *Warren K. Rich,* Associate Attorney General, *Francis X. Bellotti,* Attorney General of Massachusetts, *Frank J. Kelley,* Attorney General of Michigan, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman,* Assistant Attorney General, *A. F. Summer,* Attorney General of Mississippi, *John C. Danforth,* Attorney General of Missouri, and *Robert M. Lindholm,* Assistant Attorney General, *Paul L. Douglas,* Attorney General of Nebraska, and *Harold Mosher,* Assistant Attorney General, *Tony Anaya,* Attorney General of New Mexico, and *Douglas W. Fraser,* Assistant Attorney General, *Louis J. Lefkowitz,* Attorney General of New York, *Rufus L. Edmisten,* Attorney General of North Carolina, *Allen I. Olson,* Attorney General of North Dakota, *James R. Barnett,* Assistant Attorney General of Oklahoma, *R. A. Ashley, Jr.,* Attorney General of Tennessee, and *William B. Hubbard,* Assistant Attorney General, *M. Jerome Diamond,* Attorney General of Vermont, and *Benson D. Scotch,* Deputy Attorney General, *Slade Gorton,* Attorney General of Washington, and *Charles B. Roe, Jr.,* Senior Assistant Attorney General, and *Bronson C. LaFollette,* Attorney General of Wisconsin.†

---

†Briefs of *amici curiae* urging reversal in both cases were filed by *Vernon B. Romney,* Attorney General, and *William C.*

MR. JUSTICE POWELL delivered the opinion of the Court.

Section 102 (2)(C) of the National Environmental Policy Act of 1969[1] (NEPA) requires that all federal agencies include a detailed statement of environmental consequences—known as an environmental impact statement—"in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U. S. C. § 4332 (2)(C). The United States Court of Appeals for the District of Columbia Circuit held that officials of the Department of the Interior (Department) and certain other federal agencies must take additional steps under this section, beyond those already taken, before allowing further development of federal coal reserves in a specific area of the country. For the reasons set forth, we reverse.

I

Respondents, several organizations concerned with the environment, brought this suit in July 1973 in the United States District Court for the District of Columbia.[2] The defendants in the suit, petitioners here, were the offi-

*Quigley,* Assistant Attorney General, for the State of Utah; by *William C. Wise* and *Robert Weinberg* for the American Public Power Assn. et al.; by *Roberts B. Owen, James R. Atwood,* and *Robert M. Perry* for the Carter Oil Co.; by *Ronald A. Zumbrun* and *Raymond M. Momboisse* for the Pacific Legal Foundation; by *Gerry Levenberg, Sidney G. Baucom,* and *Verl R. Topham* for the Utah Power & Light Co.; and by *Edward Weinberg* and *John Schwab* for the Western Fuels Assn., Inc., et al.

*George W. Pring* filed a brief for the Environmental Defense Fund, Inc., et al. as ·*amici curiae* urging affirmance in both cases.

[1] 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*

[2] Respondents asserted jurisdiction under 5 U. S. C. §§ 701–706, 28 U. S. C. § 1331 (a), and 28 U. S. C. § 1361.

cials of the Department and other federal agencies responsible for issuing coal leases, approving mining plans, granting rights-of-way, and taking the other actions necessary to enable private companies and public utilities to develop coal reserves on land owned or controlled by the Federal Government. Citing widespread interest in the reserves of a region identified as the "Northern Great Plains region," and an alleged threat from coal-related operations to their members' enjoyment of the region's environment, respondents claimed that the federal officials could not allow further development without preparing a "comprehensive environmental impact statement" under § 102 (2)(C) on the entire region. They sought declaratory and injunctive relief.

The District Court, on the basis of extensive findings of fact and conclusions of law, held that the complaint stated no claim for relief and granted the petitioners' motions for summary judgment.[3]   Respondents appealed. Shortly after oral argument but before issuing an opinion on the merits, the Court of Appeals in January 1975 issued an injunction—over a dissent—against the Department's approval of four mining plans in the Powder River Coal Basin, which is one small but coal-rich section of the region that concerns respondents. 166 U. S. App. D. C. 200, 509 F. 2d 533. An impact statement had been prepared on these plans, but it had not been before the District Court and was not before the Court of Appeals. In June 1975 the Court of Appeals ruled on the merits and, for reasons discussed below, reversed the District Court and remanded for further proceedings.

---

[3] Prior to ruling on motions for summary judgment, the District Court permitted intervention as defendants by several public utilities, coal mining companies, and natural gas companies, by an Indian tribe, and by an individual rancher. Most of these intervenors have joined in a separate petition for certiorari in No. 75-561, which is decided together with this case.

169 U. S. App. D. C. 20, 514 F. 2d 856. The court continued its injunction in force.

The federal officials petitioned for writ of certiorari on October 9, 1975. On November 7, the Court of Appeals refused to dissolve its injunction,[4] and a week later petitioners moved this Court for a stay. On January 12, 1976, we stayed the injunction and granted the petitions for certiorari. 423 U. S. 1047. We have been informed that shortly thereafter the Secretary of the Interior (Secretary) approved the four mining plans in the Powder River Coal Basin that had been stayed by the injunction.

## II

The record and the opinions of the courts below contain extensive facts about coal development and the geographic area involved in this suit. The facts that we consider essential, however, can be stated briefly.

The Northern Great Plains region identified in respondents' complaint encompasses portions of four States—northeastern Wyoming, eastern Montana, western North Dakota, and western South Dakota. There is no dispute about its richness in coal, nor about the waxing interest in developing that coal, nor about the crucial role the federal petitioners will play due to the significant percentage of the coal to which they control access. The Department has initiated, in this decade, three studies in areas either inclusive of or included within this

---

[4] On the same date the Court of Appeals remanded to the District Court respondents' motion for modification of the injunction to prohibit the Secretary from approving a new mining plan submitted by a coal company, not then a party to the suit, that had been mining coal on leased federal land since 1972. The new mining plan was covered by an impact statement. The Secretary of the Interior approved the plan on November 11. On November 14, the District Court partially enjoined the company from mining under the approved plan.

region. The North Central Power Study was addressed
to the potential for coordinated development of electric
power in an area encompassing all or part of 15 States in
the North Central United States. It aborted in 1972 for
lack of interest on the part of electric utilities. The
Montana-Wyoming Aqueducts Study, intended to recom-
mend the best use of water resources for coal development
in southeastern Montana and northeastern Wyoming,
was suspended in 1972 with the initiation of the third
study, the Northern Great Plains Resources Program
(NGPRP).

While the record does not reveal the degree of concern
with environmental matters in the first two studies, it
is clear that the NGPRP was devoted entirely to the
environment. It was carried out by an interagency, fed-
eral-state task force with public participation, and was
designed "to assess the potential social, economic and
environmental impacts" from resource development in
five States—Montana, Wyoming, South Dakota, North
Dakota, and Nebraska.[5] Its primary objective was "to
provide an analytical and informational framework for
policy and planning decisions at all levels of govern-
ment" [6] by formulating several "scenarios" showing the
probable consequences for the area's environment and
culture from the various possible techniques and levels
of resource development. The final interim report of the
NGPRP was issued August 1, 1975, shortly after the de-
cision of the Court of Appeals in this case.

In addition, since 1973 the Department has engaged
in a complete review of its coal-leasing program for the
entire Nation. On February 17 of that year the Secre-
tary announced the review and announced also that dur-
ing study a "short-term leasing policy" would prevail,

[5] Department of Interior News Release (Oct. 3, 1972), App. 132.
[6] NGPRP outline, App. 136.

under which new leasing would be restricted to narrowly defined circumstances and even then allowed only when an environmental impact statement had been prepared if required under NEPA.[7] The purpose of the program review was to study the environmental impact of the Department's entire range of coal-related activities and to develop a planning system to guide the national leasing program. The impact statement, known as the "Coal Programmatic EIS," went through several drafts before issuing in final form on September 19, 1975—shortly before the petitions for certiorari were filed in this case. The Coal Programmatic EIS proposed a new leasing program based on a complex planning system called the Energy Minerals Activity Recommendation System (EMARS), and assessed the prospective environmental impact of the new program as well as the alternatives to it. We have been informed by the parties to this litigation that the Secretary is in the process of implementing the new program.[8]

Against this factual background, we turn now to consider the issues raised by this case in the status in which it reached this Court.

### III

The major issue remains the one with which the suit began: whether NEPA requires petitioners to prepare an environmental impact statement on the entire Northern Great Plains region.[9] Petitioners, arguing the negative,

---

[7] Department of Interior News Release (Feb. 17, 1973), App. 125–127.

[8] The petitioners in No. 75–561 have included in their brief a press release by the Secretary announcing the new program, and a detailed description of the program. Pending full operation thereof, the short-term leasing policy remains in effect.

[9] In the District Court respondents also contended that petitioners had failed to comply with §§ 102 (2) (A) and (D), 42 U. S. C. §§ 4332 (2) (A) and (D), which require an agency to use a specified

rely squarely upon the facts of the case and the language of § 102 (2)(C) of NEPA. We find their reliance well placed.

As noted in the first sentence of this opinion, § 102 (2)(C) requires an impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." Since no one has suggested that petitioners have proposed legislation on respondents' region, the controlling phrase in this section of the Act, for this case, is "major Federal actions." Respondents can prevail only if there has been a report or recommendation on a proposal for major federal action with respect to the Northern Great Plains region. Our statement of the relevant facts shows there has been none; instead, all proposals are for actions of either local or national scope.

The local actions are the decisions by the various petioners to issue a lease, approve a mining plan, issue a right-of-way permit, or take other action to allow private activity at some point within the region identified by respondents. Several Courts of Appeals have held that an impact statement must be included in the report or recommendation on a proposal for such action if the private activity to be permitted is one "significantly affecting the quality of the human environment" within the meaning of § 102 (2)(C). See, e. g., *Scientists' Institute for Public Information, Inc.* v. *AEC,* 156 U. S. App. D. C. 395, 404–405, 481 F. 2d 1079, 1088–1089 (1973); *Davis* v. *Morton,* 469 F. 2d 593 (CA10 1972).

approach to decisionmaking and to describe alternatives when a proposal involves unresolved conflicts concerning uses of resources. (Subparagraph (D) was redesignated subparagraph (E) by Pub. L. 94-83, 89 Stat. 424.) The District Court ruled against respondents on the count based on these subparagraphs, and it has dropped out of the case.

The petitioners do not dispute this requirement in this case, and indeed have prepared impact statements on several proposed actions of this type in the Northern Great Plains during the course of this litigation.[10] Similarly, the federal petitioners agreed at oral argument that § 102 (2)(C) required the Coal Programmatic EIS that was prepared in tandem with the new national coal-leasing program and included as part of the final report on the proposal for adoption of that program. Tr. of Oral Arg. 9. Their admission is well made, for the new leasing program is a coherent plan of national scope, and its adoption surely has significant environmental consequences.

But there is no evidence in the record of an action or a proposal for an action of regional scope. The District Court, in fact, expressly found that there was no existing or proposed plan or program on the part of the Federal Government for the regional development of the area described in respondents' complaint. It found also that the three studies initiated by the Department in areas either included within or inclusive of respondents' region—that is, the Montana-Wyoming Aqueducts Study, the North Central Power Study, and the

---

[10] In an affidavit submitted in support of the application for a stay of the Court of Appeals' injunction, the Secretary described four impact statements completed by the petitioners on coal-related activity in Montana and Wyoming. One was the multiproject statement on the Powder River Coal Basin that was the subject of that injunction. See *supra*, at 395–396. Another was on the single mining plan subsequently brought under the injunction as modified by the District Court. See n. 4, *supra*. A third covered one leased tract, and apparently was occasioned by an application for approval of a new mining plan on the tract. The fourth, on another single mining plan, has been the subject of litigation, on the merits of which we intimate no view. See *Cady* v. *Morton*, 527 F. 2d 786 (CA9 1975).

NGPRP—were not parts of any plan or program to develop or encourage development of the Northern Great Plains. That court found no evidence that the individual coal development projects undertaken or proposed by private industry and public utilities in that part of the country are integrated into a plan or otherwise interrelated. These findings were not disturbed by the Court of Appeals, and they remain fully supported by the record in this Court.[11]

Quite apart from the fact that the statutory language requires an impact statement only in the event of a proposed action,[12] respondents' desire for a regional environmental impact statement cannot be met for practical reasons. In the absence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement. Section 102 (2)(C) requires that an impact statement contain, in essence, a detailed statement of the expected adverse environmental consequences of an action, the resource commitments involved

---

[11] The Secretary's affidavit in support of the application for a stay of the Court of Appeals' injunction confirms that the situation regarding regional planning or a regional development program has not changed. See App. 195–196.

[12] The legislative history of NEPA fully supports our reading of § 102 (2)(C) as to when an impact statement is required. The bill passed by the House contained no provision comparable to § 102 (2)(C) of the Act. The bill that was reported to and, as amended, passed by the Senate did contain the forerunner of § 102 (2)(C). The committee report made clear that the impact statement was required in conjunction with specific proposals for action. S. Rep. No. 91–296, p. 20 (1969). After the House-Senate Conference, the managers on the part of the House, in a separate statement, explained § 102 (2)(C) in language that tracks the statute on the requirement of a proposal. H. R. Conf. Rep. No. 91–765, p. 8 (1969). See also 115 Cong. Rec. 40420 (1969).

in it, and the alternatives to it.[13]   Absent an overall plan
for regional development, it is impossible to predict the
level of coal-related activity that will occur in the region
identified by respondents, and thus impossible to analyze
the environmental consequences and the resource com-
mitments involved in, and the alternatives to, such activ-
ity.   A regional plan would define fairly precisely the
scope and limits of the proposed development of the
region.   Where no such plan exists, any attempt to pro-
duce an impact statement would be little more than a
study along the lines of the NGPRP, containing esti-
mates of potential development and attendant environ-
mental consequences.   There would be no factual predi-
cate for the production of an environmental impact
statement of the type envisioned by NEPA.[14]

---

[13] Section  102 (2) (C)  states  that  the  statement  must  be  a
detailed statement on—

"(i) the environmental impact of the *proposed action,*

"(ii) any adverse environmental effects which cannot be avoided
should the *proposal* be implemented,

"(iii) alternatives to the *proposed action,*

"(iv) the relationship between local short-term uses of man's
environment and the maintenance and enhancement of long-term
productivity, and

"(v) any irreversible and irretrievable commitments of resources
which would be involved in the *proposed action* should it be imple-
mented." (Emphasis added.)

[14] In contrast, with both an individual coal-related action and
the new national coal-leasing program, an agency deals with specific
action of known dimensions.  With appropriate allowances for the
inexactness of all predictive ventures, the agency can analyze the
environmental consequences and describe alternatives as envisioned
by § 102 (2) (C).  Of course, since the kind of impact statement
required depends upon the kind of " 'federal action' being taken,"
*Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U. S. 289, 322 (1975),
the statement on a proposed mining plan or a lease application
may bear little resemblance to the statement on the national
coal-leasing program.  Nevertheless, in each case the bounds of the

## IV

### A

The Court of Appeals, in reversing the District Court, did not find that there was a regional plan or program for development of the Northern Great Plains region. It accepted all of the District Court's findings of fact, but concluded nevertheless that the petitioners "contemplated" a regional plan or program. The court thought that the North Central Power Study, the Montana-Wyoming Aqueducts Study, and the NGPRP all constituted "attempts to control development" by individual companies on a regional scale. It also concluded that the interim report of the NGPRP, then expected to be released at any time, would provide the petitioners with the information needed to formulate the regional plan they had been "contemplating." The Court therefore remanded with instructions to the petitioners to inform the District Court of their role in the further development of the region within 30 days after the NGPRP interim report issued; if they decided to control that development, an impact statement would be required.

We conclude that the Court of Appeals erred in both its factual assumptions and its interpretation of NEPA. We think the court was mistaken in concluding, on the record before it, that the petitioners were "contemplating" a regional development plan or program. It considered the several studies undertaken by the petitioners to represent attempts to control development on a regional scale. This conclusion was based on a finding by the District Court that those studies, as well as the new national coal-leasing policy, were "attempts to control development by individual companies in a manner consistent with the policies and procedures of the Na-

---

analysis are defined, which is not the case with coal development in general in the region identified by respondents.

tional Environmental Policy Act of 1969." But in context, that finding meant only that the named studies were efforts to gain background environmental information for subsequent application in the decisionmaking with respect to individual coal-related projects. This is the sense in which the District Court spoke of controlling development consistently with NEPA. Indeed, in the same paragraph containing the language relied upon by the Court of Appeals, the District Court expressly found that the studies were not part of a plan or program to develop or encourage development. See *supra,* at 400–401.

Moreover, at the time the Court of Appeals ruled there was no indication in the record that the NGPRP was aimed toward a regional plan or program, and subsequent events have shown that this was not its purpose. The interim report of the study, issued shortly after the Court of Appeals ruled, described the effects of several possible rates of coal development but stated in its preface that the alternatives "are for study and comparison only; they do not represent specific plans or proposals." All parties agreed in this Court that there still exists no proposal for a regional plan or program of development. See Tr. of Oral Arg. 48.

Even had the record justified a finding that a regional program was contemplated by the petitioners, the legal conclusion drawn by the Court of Appeals cannot be squared with the Act. The court recognized that the mere "contemplation" of certain action is not sufficient to require an impact statement. But it believed the statute nevertheless empowers a court to require the preparation of an impact statement to begin at some point prior to the formal recommendation or report on a proposal. The Court of Appeals accordingly devised its own four-part "balancing" test for determining when, during the contemplation of a plan or

other type of federal action, an agency must begin a statement. The factors to be considered were identified as the likelihood and imminence of the program's coming to fruition, the extent to which information is available on the effects of implementing the expected program and on alternatives thereto, the extent to which irretrievable commitments are being made and options precluded "as refinement of the proposal progresses," and the severity of the environmental effects should the action be implemented.

The Court of Appeals thought that as to two of these factors—the availability of information on the effects of any regional development program, and the severity of those effects—the time already was "ripe" for an impact statement. It deemed the record unclear, however, as to the likelihood of the petitioners' actually producing a plan to control the development, and surmised that irretrievable commitments were being avoided because petitioners had ceased approving most coal-related projects while the NGPRP study was underway. The court also thought that the imminent release of the NGPRP interim report would provide the officials with sufficient information to define their role in development of the region, and it believed that as soon as the NGPRP was completed the petitioners would begin approving individual projects in the region, thus permitting irrevocable commitments of resources. It was for this reason that the court in its remand required the petitioners to report to the District Court their decision on the federal role with respect to the Northern Great Plains as a region within 30 days after issuance of the NGPRP report.

The Court's reasoning and action find no support in the language or legislative history of NEPA. The statute clearly states when an impact statement is required, and mentions nothing about a balancing of factors. Rather, as we noted last Term, under the first

sentence of § 102 (2) (C) the moment at which an agency must have a final statement ready "is the time at which it makes a recommendation or report on a *proposal* for federal action." *Aberdeen & Rockfish R. Co.* v. *SCRAP*, 422 U. S. 289, 320 (1975) (*SCRAP II*) (emphasis in original). The procedural duty imposed upon agencies by this section is quite precise, and the role of the courts in enforcing that duty is similarly precise. A court has no authority to depart from the statutory language and, by a balancing of court-devised factors, determine a point during the germination process of a potential proposal at which an impact statement *should be prepared*. Such an assertion of judicial authority would leave the agencies uncertain as to their procedural duties under NEPA, would invite judicial involvement in the day-to-day decisionmaking process of the agencies, and would invite litigation. As the contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal action, it may be assumed that the balancing process devised by the Court of Appeals also would result in the preparation of a good many unnecessary impact statements.[15]

---

[15] This is not to say that § 102 (2) (C) imposes no duties upon an agency prior to its making a report or recommendation on a proposal for action. The section states that prior to preparing the impact statement the responsible official "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." Thus, the section contemplates a consideration of environmental factors by agencies during the evolution of a report or recommendation on a proposal. But the time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement. This is the point at which an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption.

## B

Assuming that the Court of Appeals' theory about "contemplation" of regional action would permit a court to require preproposal preparation of an impact statement, the court's injunction against the Secretary's approval of the four mining plans in the Powder River Basin nevertheless would have been error. The District Court had found that respondents would not have been entitled to an injunction against any individual projects even if their claim of the need for a regional impact statement had been valid, because they had shown no irreparable harm that would result absent such an injunction and the record disclosed that irreparable harm *would* result to the intervenors who sought to carry out their business ventures and to the public who depended upon their operations. The Court of Appeals made no finding as to the equities at the time it originally entered the injunction; when it continued the injunction following its decision on the merits, it stated only that the "harm" justifying an injunction "matured" whenever an impact statement is due and not filed. But on the Court of Appeals' own terms there was in fact no harm. First, the Court of Appeals itself held that no regional impact statement was due at that moment, and it was uncertain whether one ever would be due. Second, there had been filed a comprehensive impact statement on the proposed Powder River Basin mining plans themselves, and its adequacy had not been challenged either before the District Court or the Court of Appeals in this case, or anywhere else.[16] Thus, in simple equitable terms there were

---

[16] Even had the Court of Appeals determined that a regional impact statement was due at that moment, it still would have erred in enjoining approval of the four mining plans unless it had made a finding that the impact statement covering them inadequately analyzed the environmental impacts of, and the alternatives to,

no grounds for the injunction: the District Court's finding of irreparable injury to the intervenors and to the public still stood, and there were—on the Court of Appeals' own terms—no countervailing equities.

## V

Our discussion thus far has been addressed primarily to the decision of the Court of Appeals. It remains, however, to consider the contention now urged by respondents. They have not attempted to support the Court of Appeals' decision. Instead, respondents renew an argument they appear to have made to the Court of Appeals, but which that court did not reach. Respondents insist that, even without a comprehensive federal plan for the development of the Northern Great Plains, a "regional" impact statement nevertheless is required on all coal-related projects in the region because they are intimately related.

There are two ways to view this contention. First, it amounts to an attack on the sufficiency of the impact statements already prepared by the petitioners on the coal-related projects that they have approved or stand ready to approve. As such, we cannot consider it in this proceeding, for the case was not brought as a challenge to a particular impact statement and there is no impact statement in the record.[17] It also is possible to view the

---

their approval. So long as the statement covering them was adequate, there would have been no reason to enjoin their approval pending preparation of a broader regional statement; that broader statement, when prepared, simply would have taken into consideration the regional environmental effects of the four mining plans once they were in operation, in determining the permissibility of further coal-related operations in the region. See Part V, *infra*.

[17] Petitioners lodged with this Court a copy of the massive six-volume impact statement on the projects in the Powder River Coal Basin, but it is not part of the record.

respondents' argument as an attack upon the decision of the petitioners not to prepare one comprehensive impact statement on all proposed projects in the region. This contention properly is before us, for the petitioners have made it clear they do not intend to prepare such a statement.

We begin by stating our general agreement with respondents' basic premise that § 102 (2)(C) may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time. NEPA announced a national policy of environmental protection and placed a responsibility upon the Federal Government to further specific environmental goals by "all practicable means, consistent with other essential considerations of national policy." § 101 (b), 42 U. S. C. § 4331 (b). Section 102 (2)(C) is one of the "action-forcing" provisions intended as a directive to "all agencies to assure consideration of the environmental impact of their actions in decisionmaking." Conference Report on NEPA, 115 Cong. Rec. 40416 (1969).[18] By requiring an impact statement Congress intended to assure such consideration during the development of a proposal or—as in this case—during the formulation of a position on a proposal submitted by private parties.[19] A comprehensive impact statement may be necessary in some cases for an agency to meet

---

[18] The term "action-forcing" was applied to the provisions of what became § 102 (2) throughout their consideration by the Senate. See, e. g., S. Rep. No. 91–296, p. 9 (1969); 115 Cong. Rec. 40416, 40419 (1969).

[19] The legislative history of the provision in the Senate, where it originated and where it received the most attention, supports this interpretation. See S. Rep. No. 91–296, supra, at 2, 20–21; 115 Cong. Rec. 29052–29053, 29055, 29058, 40416 (1969). The Conference Report to the House is consistent. See id., at 40923–40928.

this duty. Thus, when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.[20] Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.[21]

Agreement to this extent with respondents' premise, however, does not require acceptance of their conclusion that all proposed coal-related actions in the Northern Great Plains region are so "related" as to require their analysis in a single comprehensive impact statement. Respondents informed us that the Secretary recently adopted an approach to impact statements on coal-related actions that provides:

"A. As a general proposition, and as determined by the Secretary, when action is proposed involving

---

[20] At some points in their brief respondents appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already have been proposed. The statute, however, speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects. Cf. n. 26, *infra*.

[21] Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. See *Scenic Hudson Preservation Conference* v. *FPC*, 453 F. 2d 463, 481 (CA2 1971), cert. denied, 407 U. S. 926 (1972). The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Natural Resources Defense Council* v. *Morton*, 148 U. S. App. D. C. 5, 16, 458 F. 2d 827, 838 (1972).

coal development such as issuing several coal leases or approving mining plans in the same region, such actions will be covered by a single EIS rather than by multiple statements. In such cases, the region covered will be determined by basin boundaries, drainage areas, areas of common reclamation problems, administrative boundaries, areas of economic interdependence, and other relevant factors." Brief for Respondents 20a.

At another point, the document containing the Secretary's approach [22] states that a "regional EIS" will be prepared "if a series of proposed actions with interrelated impacts are involved . . . unless a previous EIS has sufficiently analyzed the impacts of the proposed action(s)." *Id.*, at 20a–21a. Thus, the Department has decided to prepare comprehensive impact statements of the type contemplated by § 102 (2)(C), although it has not

---

[22] The document is an "Executive Summary and Decision Document" signed by the Secretary and dated December 16, 1975. The decision as to impact statements is part of the implementation of the new coal-leasing policy based on staff recommendations following release of the Coal Programmatic EIS. See *supra*, at 397–398.

Respondents contend that this document represents a significant shift in Department policy since the start of this litigation, but we disagree. Early in the litigation the Department and three other agencies prepared the comprehensive impact statement on proposed actions in the Powder River Coal Basin, see *supra*, at 395; its preface—quoted by the District Court—states that it evaluated "the collective impact of the proposed actions and, insofar as now possible, the impacts of potential future coal mining within the geographic area." Moreover, the Secretary's consistent position, in affidavits dating back to the District Court, has been that statements might be prepared on regions or "subregions" once the Coal Programmatic EIS was completed. While the affidavits did not, until the application for a stay of the injunction, expressly predicate preparation of such statements upon the pendency of several proposals within the region or subregion, neither are they inconsistent with such predication.

deemed it appropriate to prepare such a statement on all proposed actions in the region identified by respondents.

Respondents conceded at oral argument that to prevail they must show that petitioners have acted arbitrarily in refusing to prepare one comprehensive statement on this entire region, and we agree. Tr. of Oral Arg. 67. The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. Cf. *SCRAP II,* 422 U. S., at 325–326. Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately. Respondents have made no showing to the contrary.

Respondents' basic argument is that one comprehensive statement on the Northern Great Plains is required because all coal-related activity in that region is "programmatically," "geographically," and "environmentally" related. Both the alleged "programmatic" relationship and the alleged "geographic" relationship resolve, ultimately, into an argument that the region is proper for a comprehensive impact statement because the petitioners themselves have approached environmental study in this area on a regional basis.[23] Respondents point primarily to the NGPRP, which they claim—and petitioners

---

[23] On the "programmatic" relationship, respondents also rely on the assertion that all of the projects involve similar methods of mining and converting the region's coal. Assuming this to be correct, we do not think it significant.

deny—focused on the region described in the complaint.[24] The precise region of the NGPRP is unimportant, for its irrelevance to the delineation of an appropriate area for analysis in a comprehensive impact statement has been well stated by the Secretary:

"Resource studies [like the NGPRP] are one of many analytical tools employed by the Department to inform itself as to general resource availability, resource need and general environmental considerations so that it can intelligently determine the scope of environmental analysis and review specific actions it may take. Simply put, resource studies are a prelude to informed agency planning, and provide the data base on which the Department may decide to take specific actions for which impact statements are prepared. The scope of environmental impact statements seldom coincide with that of a given resource study, since the statements evolve from specific proposals for federal action while the studies simply provide an educational backdrop." Affidavit of Oct. 28, 1975, App. 191.

As for the alleged "environmental" relationship, respondents contend that the coal-related projects "will produce a wide variety of cumulative environmental impacts" throughout the Northern Great Plains region. They described them as follows: Diminished availability of water, air and water pollution, increases in population and industrial densities, and perhaps even climatic changes. Cumulative environmental impacts are, indeed, what require a comprehensive impact statement.

---

[24] They rely also on the North Central Power Study and the Montana-Wyoming Aqueducts Study, but each covered an area different from respondents' region and, moreover, it is not clear that either was primarily an environmental study. See *supra*, at 397.

But determination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies. Petitioners dispute respondents' contentions that the interrelationship of environmental impacts is region-wide [25] and, as respondents' own submissions indicate, petitioners appear to have determined that the appropriate scope of comprehensive statements should be based on basins, drainage areas, and other factors. See *supra*, at 410–411. We cannot say that petitioners' choices are arbitrary. Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements.

In sum, respondents' contention as to the relationships between all proposed coal-related projects in the Northern Great Plains region does not require that petitioners prepare one comprehensive impact statement covering all before proceeding to approve specific pending applications.[26] As we already have determined that there

---

[25] For example, respondents assert that coal mines in the region are environmentally interrelated because opening one reduces the supply of water in the region for others. Petitioners contend that the water supply for each aquifer or basin within the region—of which there are many—is independent.

Moreover, petitioners state in their reply brief that few active or proposed mines in respondents' region are located within 50 miles of any other mine, and there are only 30 active or proposed mines in the entire 90,000 square miles of the region.

[26] Nor is it necessary that petitioners always complete a comprehensive impact statement on all proposed actions in an appropriate region before approving any of the projects. As petitioners have emphasized, and respondents have not disputed, approval of one lease or mining plan does not commit the Secretary to approval of any others; nor, apparently, do single approvals by the other peti-

exists no proposal for regionwide action that could require a regional impact statement, the judgment of the Court of Appeals must be reversed, and the judgment of the District Court reinstated and affirmed. The case is remanded for proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring in part and dissenting in part.

While I agree with much of the Court's opinion, I must dissent from Part IV, which holds that the federal courts may not remedy violations of the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*—no matter how blatant—until it is too late for an adequate remedy to be formulated. As the Court today recognizes, NEPA contemplates agency consideration of environmental factors throughout the decisionmaking process. Since NEPA's enactment, however, litigation has been brought primarily at the end of that process—challenging agency decisions to act made without adequate environmental impact statements or without any statements at all. In such situations, the courts have had to content themselves with the largely unsatisfactory remedy of enjoining the proposed federal action and ordering the preparation of an adequate impact statement. This remedy is insufficient because, except by deterrence, it does nothing to further early consideration of environmental factors. And, as

tioners commit them to subsequent approvals. Thus, an agency could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals. Cf. n. 20, *supra.*

with all after-the-fact remedies, a remand for preparation of an impact statement after the basic decision to act has been made invites *post hoc* rationalizations, cf. *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 419–420 (1971), rather than the candid and balanced environmental assessments envisioned by NEPA. Moreover, the remedy is wasteful of resources and time, causing fully developed plans for action to be laid aside while an impact statement is prepared.

Nonetheless, until this lawsuit, such belated remedies were all the federal courts had had the opportunity to impose under NEPA. In this case, confronted with a situation in which, according to respondents' allegations, federal agencies were violating NEPA prior to their basic decision to act, the Court of Appeals for the District of Columbia Circuit seized the opportunity to devise a different and effective remedy. It recognized a narrow class of cases—essentially those where both the likelihood of eventual agency action and the danger posed by nonpreparation of an environmental impact statement were great—in which it would allow judicial intervention prior to the time at which an impact statement must be ready. The Court today loses sight of the inadequacy of other remedies and the narrowness of the category constructed by the Court of Appeals, and construes NEPA so as to preclude a court from ever intervening prior to a formal agency proposal. This decision, which unnecessarily limits the ability of the federal courts to effectuate the intent of NEPA, is mandated neither by the statute nor by the various equitable considerations upon which the Court relies.

## I

The premises of the Court of Appeals' approach are not novel and indeed are reaffirmed by the Court today.

Under § 102 (2) (C) of NEPA, 42 U. S. C. § 4332 (2) (C), "the moment at which an agency *must have a final [environmental impact] statement ready* 'is the time at which it makes a recommendation or report on a *proposal* for federal action.'" *Ante,* at 406, quoting *Aberdeen & Rockfish R. Co.* v. *SCRAP,* 422 U. S. 289, 320 (1975) (first emphasis added). Preparation of an impact statement, particularly on a complicated project, takes a considerable amount of time. *Flint Ridge Dev. Co.* v. *Scenic Rivers Assn.,* 426 U. S. 776, 789 n. 10 (1976); Sixth Annual Report, Council on Environmental Quality 639 (1975). Necessarily, if the statement is to be completed by the time the agency makes its formal proposal to act, preparation must begin substantially before the proposal must be ready. In this litigation, for instance, the federal petitioners assert that a statement on the region in which respondents are interested would take more than three years to complete. Brief for Federal Petitioners 28 n. 22. Accordingly, since it would violate NEPA for the Government to propose a plan for regional development of the Northern Great Plains without an accompanying environmental impact statement, if the Government contemplates making such a proposal at any time in the next three years it should already be working on its impact statement.

But an early start on the statement is more than a procedural necessity. Early consideration of environmental consequences through production of an environmental impact statement is the whole point of NEPA, as the Court recognizes. The legislative history of NEPA demonstrates that "[b]y requiring an impact statement Congress intended to assure [environmental] consideration *during the development of a proposal* . . . ." *Ante,* at 409 (emphasis added). Compliance with this duty allows the decisionmaker to take environmental

factors into account when he is making decisions, at a time when he has an open mind and is more likely to be receptive to such considerations. Thus, the final impact statement itself is but "the tip of an iceberg, the visible evidence of an underlying planning and decision-making process that is usually unnoticed by the public." Sixth Annual Report, Council on Environmental Quality 628 (1975).

Because an early start in preparing an impact statement is necessary if an agency is to comply with NEPA, there comes a time when an agency that fails to begin preparation of a statement on a contemplated project is violating the law. It is this fact, which is not disputed by the Court today, that was recognized by the Court of Appeals and that formed the basis of its remedy. The Court devised a four-part test to enable a reviewing court to determine when judicial intervention might be proper in such cases. The questions formulated by the Court of Appeals were:

> "How likely is the program to come to fruition, and how soon will that occur? To what extent is meaningful information presently available on the effects of implementation of the program, and of alternatives and their effects? To what extent are irretrievable commitments being made and options precluded as refinement of the proposal progresses? How severe will be the environmental effects if the program is implemented?" 169 U. S. App. D. C. 20, 44, 514 F. 2d 856, 880 (1975).

While the Court's disapproval of this four-part inquiry precludes any future demonstration of its workability, the test is designed to allow judicial intervention only in the small number of cases where the need for work to begin on an environmental impact statement is clear

and the agency violation blatant.[1] And, indeed, the Court of Appeals refused to find a violation here, concluding instead that on two of the four factors the evidence was such as to negate the need for a prompt start on an impact statement.

---

[1] Nothing in *Flint Ridge Dev. Co.* v. *Scenic Rivers Assn.*, 426 U. S. 776 (1976), suggests that work on an impact statement cannot successfully begin in situations identified by this four-part test. In *Flint Ridge*, in considering whether an agency should begin work on an impact statement arguably necessary for federal approval of certain private action by a real estate developer, we rejected the claim that the agency should begin work before the private action was submitted to the agency for approval. "The agency could not fruitfully begin the impact statement until the developer's plans were fully or largely worked out . . . ." *Id.*, at 791 n. 13.

This language is not contrary to the Court of Appeals' position here for two reasons. First, the quoted language recognizes that an impact statement could be begun when the developer's plans were largely worked out, essentially the situation the four-part test would identify as appropriate for initiation of work on an impact statement. Second, and more important, *Flint Ridge* concerned federal approval of private action rather than federal initiation of its own project, at issue here. This distinction has been recognized before, *Aberdeen & Rockfish R. Co.* v. *SCRAP*, 422 U. S. 289, 320 (1975), and is recognized by the Court today. When the federal agency is initiating its own proposal, NEPA is more demanding. In such circumstances, NEPA is "intended to assure [environmental] consideration during the development of [the] proposal," whereas when private action is to be approved, NEPA seeks only to assure such consideration "during the formulation of a position on [the] proposal submitted by private parties." *Ante*, at 409 (footnote omitted).

Nor are other parts of the Court's opinion today inconsistent with the Court of Appeals' approach. While it is true in general, as the Court observes, that in the absence of a proposal there is nothing for an impact statement to analyze, *ante*, at 401–402, the observation is a generalization plainly inapplicable to situations identified by the four-part test.

## II

I believe the Court of Appeals' test is a sensible way to approach enforcement of NEPA, and none of the Court's reasons for concluding otherwise are, for me, persuasive.[2]

The Court begins its rejection of the four-part test by announcing that the procedural duty imposed on the agencies by § 102 (2)(C) is "quite precise" and leaves a court "no authority to depart from the statutory language . . . ." *Ante,* at 406. Given the history and wording of NEPA's impact statement requirement, this statement is baffling. A statute that imposes a complicated procedural requirement on all "proposals" for "major Federal actions significantly affecting the quality of the human environment" and then assiduously avoids giving any hint, either expressly or by way of legislative history, of what is meant by a "proposal" or by a "major Federal

---

[2] The Court attempts to discredit the Court of Appeals' conclusion that the Government contemplates a regional development plan or proposal. The Court confuses the possibility of such a plan—all that is needed to prompt application of the four-part test—with its reality. All the parties, the District Court, and the Court of Appeals are agreed that no regional plan exists in this case. But the Government concedes that a regional plan is contemplated in the sense the Court of Appeals used the term. "[I]t would be accurate to conclude that petitioners 'contemplate' regional planning (although not necessarily for the region defined by respondents) because, as the district court found . . . , and as the *National Impact Statement* confirms, '[i]t is possible a decision will be made to prepare a statement for the entire Northern Great Plains region, but the information available [to petitioners] may indicate that statements on smaller subregions, geologic structures, basin, or selected individual actions' will be preferable." Brief for Federal Petitioners 40 n. 32.

Thus, the Court's conclusion that "the Court of Appeals erred in . . . its factual assumptions," *ante,* at 403, either misapprehends the factual assumptions necessary to the Court of Appeals' theory or is entirely without support in the record.

action" can hardly be termed precise. In fact, this vaguely worded statute seems designed to serve as no more than a catalyst for development of a "common law" of NEPA. To date, the courts have responded in just that manner and have created such a "common law." 169 U. S. App. D. C., at 34–36, 514 F. 2d, at 870–872. Indeed, that development is the source of NEPA's success. Of course, the Court is correct that the courts may not depart from NEPA's language. They must, however, give meaning to that language if there is to be anything in NEPA to enforce at all. And that is all the Court of Appeals did in this case.

But, claims the Court, judicial intervention of the sort approved by the Court of Appeals would leave the agencies uncertain about their procedural duties under NEPA. There is no basis for this claim. The agencies already know their duties under NEPA and the Court of Appeals did not alter them. All it did was create a mechanism to allow it to enforce those pre-existing duties.

Next, the Court fears, the four-part test would "invite judicial involvement in the day-to-day decisionmaking process of the agencies . . . ." *Ante,* at 406. This concern is in part untrue and in part exaggerated. The test would certainly result in judicial involvement with the single decision whether the time is right to begin an impact statement. But this is hardly a day-to-day process, and the involvement even in that decision would be limited to timing alone. The Court of Appeals made clear that, so long as their decision was not arbitrary or capricious, "definition of the proper region for comprehensive development and, therefore, the comprehensive impact statement should be left in the hands of the federal appellees," 169 U. S. App. D. C., at 45 n. 33, 514 F. 2d, at 881 n. 33, a position which the Court adopts today. *Ante,* at 412. And, most important, a federal

court would intervene at all only when the four-part test indicated an abdication of the agency's statutory duty and the necessity for judicial intervention.

The Court is also concerned that the proposed rule would invite litigation. But the recognition of any right invites litigation, and it is a curious notion of statutory construction that makes substantive rights depend on whether persons would seek to enforce them in court. See *United States* v. *Watson,* 423 U. S. 411, 433, 452 n. 19 (1976) (MARSHALL, J., dissenting). In any case, to the extent the litigation is the result of agency noncompliance with NEPA, the Court can hardly complain about it. And to the extent the litigation is frivolous, the four-part test is a stiff one and "the plaintiff can be hastened from [the] court by summary judgment." *Barlow* v. *Collins,* 397 U. S. 159, 175 n. 10 (1970) (opinion of BRENNAN, J.).

Lastly, the Court complains, since some contemplated projects might never come to fruition, the Court of Appeals' test might result "in the preparation of a good many unnecessary impact statements." *Ante,* at 406 (footnote omitted). Even bypassing the instances in which a project is dropped as a result of environmental considerations discovered in the course of preparing an impact statement, the Court's concerns are exaggerated. The Court of Appeals showed great sensitivity to the need for federal officials to be able "to dream out loud without filing an impact statement," 169 U. S. App. D. C., at 43, 514 F. 2d, at 879, and did not seek to disturb that freedom. Indeed, a major point of the four-part test is to avoid wasted effort—including the wasted effort of enjoining an already proposed project to allow the belated preparation of an impact statement—and the Court suggests, and I can imagine, no reason why the test is unlikely to be successful in achieving that goal.

In short, the Court offers nothing but speculation, misconception, and exaggeration to reject a reasonably designed test for enforcing the duty NEPA imposes upon the federal agencies. Whatever difficulties the Court may have with the initial application of the test in this case—and I agree that an injunction was not warranted on the facts before the Court of Appeals—the Court has articulated no basis for interring the test before it has been given a chance to breathe.