N.R. SMITH, Circuit Judge,
concurring in the judgment:
I agree with the panel’s decision. The EPA’s unconditional registration of sulfox-aflor should be vacated, and the. case should be remanded to the EPA. I cannot say the EPA supported its decision with substantial evidence. However, I write separately to provide an alternate perspective.
FIFRA has its own standard of review. Under FIFRA, a reviewing court must sustain a pesticide registration if the registration “is supported by substantial evidence when considered on the record as a whole.” 7 U.S.C. § 136n(b). “Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Nat. Res. Def. Council v. EPA, 735 F.3d 873, 877 (9th Cir.2013) (quoting Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir.2009)). The standard is “relatively deferential to the agency factfinder,” but must still be “searching and careful, subjecting the agency’s decision to close judicial scrutiny.” Containerfreight Corp. v. United States, 752 F.2d 419, 422 (9th Cir.1985) (internal quotation marks omitted).
The substantial evidence standard affords an agency less deference than the arbitrary and capricious standard. See Universal Camera Corp. v. Nat’l Labor Relations Bd., 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Union Oil Co. of Cal. v. Fed. Power Comm’n, 542 F.2d 1036, 1040-41 (9th Cir.1976) (explaining that we view the substantial evidence standard as allowing greater scrutiny than the arbitrary and capricious standard). Therefore, if the EPA’s pesticide registration is arbitrary and capricious, the EPA cannot show it was supported by substantial evidence.
Under the arbitrary and capricious standard, a reviewing court must not “substitute its judgment for that of the agency.” Motor Vehicle Mfrs. Ass’n of U.S. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In addition, a court’s deference must be at its highest when examining factual disputes that “implicate[ ] substantial agency expertise.” Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 376-77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); see also Kleppe v. Sierra Club, 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (“Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.”). We discussed this deference at length in our en banc decision Lands Council v. McNair, 537 F.3d 981 (9th Cir.2008) (en banc), rev’d on other grounds by Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). In Lands Council, we explained that it “is not a proper role for a federal appellate court” to “act as a panel of scientists that instructs [an agency] how to validate its hypotheses ..., chooses among scientific *534 studies ..., and orders the agency to explain every possible scientific uncertainty.” Id. at 988. Rather, the agency “must have discretion to rely on the reasonable opinions of its own qualified experts even if ... a court might find contrary views more persuasive.” Id. at 1000 (quoting Marsh, 490 U.S. at 378, 109 S.Ct. 1851). A court must even “uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).
This paints the picture of a low hurdle for the EPA, and indeed in most cases, I find an agency meets its burden with the evidence in the record under both the arbitrary and capricious standard and the substantial evidence standard. However, although low, the hurdle exists for a reason, and the EPA cannot simply walk around it. “[T]he agency must, at a minimum, support its conclusions with studies that the agency deems reliable.” N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir.2011) (citing Lands Council, 537 F.3d at 994). And “the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a ‘rational connection between the facts found and the choice made.’ ” State Farm, 463 U.S. at 43, 103 S.Ct. 2856 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).
The EPA’s procedure and cursory explanations in this case suggest the EPA has not met even the lower bar of the arbitrary and capricious standard, much less the substantial evidence standard. The EPA has shown that it analyzed studies of sulfoxaflor, but not that it deems those studies reliable. The EPA has shown that it reviewed data, but not that its decision is rationally connected to the data. The EPA has not “articulate[d] a satisfactory explanation for its action” or provided an adequate basis for us to reasonably discern the EPA’s path. Id. at 43, 103 S.Ct. 2856. I do not ask the EPA to “explain every possible scientific uncertainty” or instruct the EPA how to improve its analysis. See Lands Council, 537 F.3d at 988. I simply ask the EPA to explain the analysis it conducted, the data it reviewed, and how the EPA relied on the data in making its final decision. Currently, the EPA’s interesting choice of procedure and lack of explanation regarding its analysis call into question the connection between the cited data and the final decision.
I. Procedure
The EPA’s procedure causes me to doubt whether the EPA adequately analyzed the effects of unconditionally registering sulfoxaflor and whether the EPA could have acquired substantial evidence on those effects. Without reiterating all the facts set out in the majority opinion, I will provide a brief timeline of the EPA’s relevant actions concerning sulfoxaflor registration.
The EPA first sought to determine the direct effects of sulfoxaflor on honey bees when applied at Dow’s proposed maximum application rate of 0.133 pounds of active ingredient per acre (lbs a.i./A). The EPA uses a Tier 1 screen to identify pesticides that do not pose any risk to pollinators. The Tier 1 method is favored because “it is easy to use, requires few input parameters, and takes little time to complete.” Sulfoxaflor failed the Tier 1 screen with risk quotients that far exceeded the level of concern. The EPA then refined its Tier 1 study to use pesticide residue data specific -to sulfoxaflor and reran the Tier 1 test. Although inefficient, the refined Tier 1 test can “provide valuable information *535 that may be used to characterize the risk of a chemical to honey bees.” Again, sul-foxaflor failed the screen. The risk quotients for honey bees at every life stage and in every caste except the queen exceeded the 0.4 level of concern. No risk-quotient was calculated for the queen. Tier 1 produces “reasonably conservative” estimates of pesticide exposure to bees, meaning the actual exposure should be less. Nonetheless, the EPA determined that risk to honey bee colonies could not be precluded.
Pursuant to procedural guidelines when the EPA identify and evaluate risk mitigation options, conduct a Tier 2 assessment, or do both. The EPA conducted a Tier 2 assessment. Tier 2 assessments are used to “obtain pesticide specific, empirically-based exposure data that potentially represent doses received by bees.” Unlike the quantitative Tier 1 studies, risks identified in Tier 2 assessments are described qualitatively. EPA’s Tier 2 assessments still purported to study application rates of 0.133 lbs a.i./A. However, only one of the six tunnel semi-field studies submitted by Dow for Tier 2 assessment used that application rate. The remaining studies tested application rates of 0.089 lbs a.i./A or less.
The EPA’s conclusions from the Tier 2 studies were tepid. The results corresponded with three categories: brood development, direct effect, and colony strength. Of brood development, the EPA stated: “Taken as a whole and in consideration of their respective limitations, the results from the six [Tier 2] tunnel studies are unable to conclusively demonstrate whether sulfoxaflor applications adversely impact brood development, even at the lower application rates used.” Regarding direct effects, the EPA stated it did not know what direct effect sulfoxaflor had on honey bees when applied at the maximum application rate of 0.133 lbs a.i./A. Instead, the EPA’s analysis of direct effects and colony strength pertained only to the lower application rates (0.089 or less). The EPA concluded that “direct effects of sul- , foxaflor on adult forager -beefs were] ... relatively short-lived, lasting three days or less.” For colony strength, the EPA concluded that the effects of sulfoxaflor were “either not apparent or modest at most.”
The EPA was critical of the six studies it analyzed at Tier 2. In speaking of sulfox-aflor’s effects on the environment as a whole, the EPA stated that its “primary uncertainty” was the “lack of a reliable Tier 2 semi-field study for assessing impacts on honey bee colony strength and brood development in accordance with OECD-established test guidelines.” The EPA also noted that Dow’s studies only-tested sulfoxaflor with cotton, so “additional data on the nature and magnitude of sulfoxaflor residues in one or more pollinator-attractive crops would be needed.”
After the Tier 2 assessments were complete, the EPA proposed conditionally registering sulfoxaflor at a reduced rate of 0.09 lbs a.i./A. In its proposed conditional registration, the EPA said nothing about later registering sulfoxaflor unconditionally at 0.09 lbs a.i./A. Rather, the EPA stated it was registering sulfoxaflor conditionally .only to provide the EPA time to obtain data “resolvfing] any residual uncertainty on the potential effects of sulfoxaflor applications on brood development and long-term colony health at the maximum application rate initially proposed ... (0.133 lbs [a.i/A]).” The EPA determined that this additional data was “necessary,” because there was “no conclusive evidence to rule out long-term and more subtle brood impacts” caused by sulfoxaflor. Regarding the lower application rate of 0.09 lbs a.i./A, the EPA said only that the data indicated “sulfoxaflor applications [would] not result in a catastrophic loss to brood *536 during the time period required for the conditional studies to be performed and assessed.” The EPA received public comment concerning the proposed conditional registration. The EPA did not conduct any additional studies.
Ultimately, the EPA neither granted the conditional registration, for which it had received public comment, nor the unconditional registration at 0.133 lbs a.i./A, for which it had requested more data. Instead, the EPA granted unconditional registration of sulfoxaflor at 0.09 lbs a.i./A with numerous mitigation measures in place. The EPA provided no opportunity for public comment on this unconditional registration. However, the EPA did argue in favor of the unconditional registration in its responses to comments made by the. public regarding the proposed conditional registration. The EPA’s decision to register sulfoxaflor unconditionally at 0.09 lbs a.i./A was not based on new evidence. Rather it was based on a “review of the public comments [on the conditional registration] and further consideration of the database.”
Based on this course of action, I have to wonder whether the EPA actually obtained substantial evidence to support the unconditional registration, shortly after it proposed the conditional registration at that same rate. I am inclined to believe the EPA instead decided to register sul-foxaflor unconditionally in response to public pressure for the product and attempted to support its decision retroactively with studies it had previously found inadequate. Such action seems capricious.
II. Explanation and Connection with Data
Setting aside the EPA’s procedure, I still do not find that the EPA supported its decision with a satisfactory explanation that was rationally connected to the facts. Specifically, I return to the EPA’s only clear statement explaining how it arrived at its final decision: “After review of the public comments and further consideration of the database, EPA has concluded that an unconditional registration of sulfoxaflor, with lowered application rates and other mitigation is supported by available data and therefore the appropriate regulatory decision.” The obvious questions in reading this explanation are: (1) What “database”? and (2) What “available data”? As the reviewing court, we must know the answers to these questions. Yet, the EPA never explains which data it included in its analysis.
From the record, it seems certain that the EPA relied on two sets of studies in making its final decision: the Tier 1 and Tier 2 studies, which were conducted to determine whether sulfoxaflor posed a risk to pollinators when applied at the maximum application rate of 0.133 lbs a.i./A. In other words, to unconditionally register sulfoxaflor at the maximum application rate of 0.09 lbs a.i./A, the EPA relied on: (1) the same Tier 1 studies that found sulfoxaflor’s risk of effects on all life stages and castes of bees exceeded the level of concern; and (2) the same Tier 2 studies that the EPA called unreliable in the executive summary of its Environmental Fate and Ecological Risk Assessment for Sul-foxaflor Registration. To be fair, the EPA only found the Tier 2 studies unreliable as to data on colony strength and brood development, not direct effects, but this does not lessen the import of that critique. Nor did the EPA’s concerns disappear after further review of the data. In its Decision Document, the EPA wrote: “The effect of sulfoxaflor on brood development is considered inconclusive due to the limitations associated with the available studies.... ” It continued: “[T]he design of the Tier 2 studies does not enable the potential for *537 long-term effects [on coloniesjto be discounted completely.”
The EPA has also provided us with no basis to determine whether the original and refined Tier 1 studies or the six Tier 2 studies conformed with procedural standards. Not only has the EPA done a poor job explaining how many tests were run and what results followed, the EPA has also failed to provide any comparison for us to determine what number of tests and what range of results are acceptable. The only guidelines we have to compare with the studies are the Organization for Economic Cooperation and Development (OECD) guidelines and the Office of Chemical Safety and Pollution Prevention (OCSPP) guidelines. The EPA does not refer to either guideline in describing the tests Dow conducted for sulfoxaflor. Instead, the EPA acknowledges that the semi-field studies submitted for Tier 2 did not comport with OECD guidelines.
The EPA argues that the EPA compensated for any uncertainties in the Tier 1 and Tier 2 studies by adopting mitigation measures. However, the EPA has not pointed to any studies in the record showing that the EPA obtained data on these mitigation measures. Nor does the EPA point to any scientific studies or testimony in the record to support its conclusions regarding the mitigation measures: See Lands Council, 537 F.3d at 994.
The EPA periodically refers to other data in the “database” throughout its responses to public comments on the proposed conditional registration, but none of these data are explained in detail in the record. For instance, the EPA refers to an “extensive analysis” of outside studies:
The EPA conducted an extensive analysis of sulfoxaflor in collaboration with counterpart agencies in Canada and Australia. Scientists from all three authorities reviewed over 400 studies, peer reviewed the primary evaluations conducted by their international colleagues, and communicated extensively on specific disciplines and issues. Additional EPA committees further reviewed the work done under the joint review project.
However, the EPA never explained the type of studies, how they were conducted, or what results were obtained. Nor did the EPA explain the outcome of its “extensive analysis,” whether this analysis conformed with similar analyses for other pesticides, or even how the EPA relied on the analysis in making its final decision. The EPA certainly did not explain any conclusions drawn from those studies or the reasons it considered the studies to be reliable. See Lands Council, 537 F.3d at 994.
Of equal concern is the EPA’s reliance on data not in the database. In its responses to public comments, the EPA frequently cites lack of information as support for its final decision. For instance, as evidence that sulfoxaflor will not cause honey bee losses, the EPA states that it “has received no reports [of] any sulfoxaf-lor-related incidents from the 2012 use under section 18 [emergency exemption] authorizations.- The state lead agencies informed EPA that they were not asked to conduct any investigations and they received no reports of adverse incidents.” And to bolster its claims that sulfoxaflor' is better than the pesticides sulfoxaflor will replace, the EPA states that it is “not aware of any information that would indicate that 'honey bee losses as a result of exposure to sulfoxaflor would exceed or be any different than those currently experienced with currently registered insecticides.” The EPA cites no studies. It is worth noting that the record contains evidence that the pesticides sulfoxaflor would replace are more harmful to honey bees than sulfoxaflor. However, the EPA has *538 not pointed to this evidence or demonstrated that it deems those studies reliable. See N. Plains Res. Council, Inc., 668 F.3d at 1075. Nor has the EPA provided a connection between the evidence in the record and the EPA’s decision. State Farm, 463 U.S. at 43, 103 S.Ct. 2856.
Rather than citing to definitive information, the EPA repeatedly dismisses data gaps and inconclusive evidence with the explanation that the EPA “believed,” “had knowledge,” or “relied on its best professional judgement.” For instance, the EPA states: “Although statistical weaknesses were documented for [the Tier 2 studies], the Agency did not rely exclusively on statistical interpretation of results in its risk findings. Rather, it relied on its best professional judgment in evaluating the magnitude and duration of effects from these studies.” The EPA also said:
Although results from longer-term tunnel studies conducted at the current maximum single application rate of 0.086 lb a.i./A are desirable for confirming the results of the Tier 1 risk assessment, the Agency believes that when results of Tier 1 and the proposed mitigation measures are considered, the existing limitations in the Tier 2 studies do not preclude registration of sulfoxaflor given the mitigation measures (such as reduced application rates and increased minimum spray intervals) that are included on the label and the benefits provided by sulfoxaflor.
Although the EPA certainly has authority to rely on its well-founded beliefs, scientifically-derived knowledge, and experience-driven professional judgment, it must support the beliefs, knowledge, and judgment with evidence. We will continue to grant agencies great deference, particularly in cases, such as this one, which involve “substantial agency expertise.” Marsh, 490 U.S. at 376, 109 S.Ct. 1851. However, there is a great difference between ordering an agency to “explain every possible scientific uncertainty,” Lands Council, 537 F.3d at 988, and requiring it to “articulate a satisfactory explanation for its action” that is based on scientific data, State Farm, 463 U.S. at 43, 103 S.Ct. 2856. Professional judgment and knowledge do not meet the substantial evidence standard independent of data and facts. Otherwise, the standard could always be met with the sworn declaration of an expert stating the expert’s experience alone made his opinion trustworthy. For me, unless I am provided with evidence of the EPA’s basis for its judgment and knowledge, I can only assume it acted with none.