**Bessie Frances WALSH, et al., Plaintiffs,**

v.

**The UNITED STATES ARMY CORPS OF ENGINEERS; Robert Page, in his Capacity as Assistant Secretary of the Army, et al., Defendants.**

**No. SA 90 CA 146.**

United States District Court, W.D. Texas, San Antonio Division.

July 9, 1990.

---

Lloyd Garza, San Antonio, Tex., for City of San Antonio.

John W. Davidson, Russell S. Johnson, and Rand J. Riklin, San Antonio, Tex., for defendant, City of San Antonio Acting by and Through its Water Works Bd. of Trustees.

Charles R. Meyer, Atty., Environmental Defense Section, Gary B. Randall and Kenton W. Fulton, Gen. Litigation Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant U.S. Army Corps of Engineers.

## MEMORANDUM OPINION

GARZA, District Judge.

By separate Order dated May 10, 1990, this Court previously denied Plaintiffs' Motion for Preliminary Injunction for failing to meet their burden of persuasion as to three prerequisites for issuance of a preliminary injunction. This Memorandum Opinion addresses the Court's reasons for such ruling.

### I.

Plaintiffs are owners of certain real property along the Medina River in Bexar County, Texas, which has been in Plaintiffs' family for over one hundred years. The land owned by Plaintiffs Bessie Frances Walsh, Audrey Jacke Hendrix Walsh, Curt Mahla, and Frances Walsh Gembler (the "Walsh Properties") has been known historically as the Perez Ranch. Plaintiff Margaret Clara Watson Condra owns an additional 250 acres (the "Condra Property") along the Medina River. The Walsh Properties and the Condra Property are situated on the location where the City of San Antonio proposes to build Applewhite Dam and Reservoir (the "Applewhite Project"). The city must acquire these properties, among others, if it is to proceed with the construction of Applewhite.

On January 23, 1990, the Walsh Plaintiffs received notice from Defendant, City of San Antonio, through the San Antonio Development Agency, that the city was prepared to initiate eminent domain proceedings against the Plaintiffs' properties. Plaintiffs did not agree to the city's offer to purchase the property. Such notice was received by Plaintiffs after the United States Army Corps of Engineers issued the San Antonio City Water Board a permit (permit number SWF–83–BEXAR–553) authorizing construction of Applewhite Dam and Reservoir on the Medina River. Construction would entail the inundation and destruction of portions of Plaintiffs' property.

By their Motion for Preliminary Injunction, Plaintiffs seek to enjoin the City of San Antonio City Water Board from initiating eminent domain proceedings against any portion of Plaintiffs' properties. Plaintiffs further seek to enjoin any activity taken in furtherance of permit No. SWF–83–BEXAR–553. Plaintiffs base their motion on the grounds that the permit was issued in violation of the Rivers and Harbors Appropriation Act of 1899, as amended, 33 U.S.C. § 401 *et seq.;* the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. § 470 *et seq.;* the National Environmental Policy Act of 1969 (NEPA), as amended, 42 U.S.C. § 4321 *et.seq.;* and sections 301 and 404 of the Clean Water Act, 33 U.S.C. § 1344. Because of the immediate possibility of eminent domain proceedings, and because construction of Applewhite is likely to commence soon thereafter, Plaintiffs brought their request for injunctive relief pursuant to FED.R.CIV.P. 65 to preserve the status quo pending adjudication of this action.

From the Defendant City's perspective the Applewhite Project is also of great importance, but for entirely different reasons. San Antonio, Texas is the largest city in the United States that depends entirely on ground water for its water supply. Its current source of water is the Edwards Aquifer. According to the Texas Water Commission, the dependable yield of the aquifer is 425,000 acre-feet per year. In 1982, the latest year for which data is available, withdrawals from the Edwards

Aquifer amounted to 453,000 acre-feet. In addition, population projections for San Antonio and Bexar County show a more than fifty percent increase of the metropolitan area by the year 2020. Based on numerous regional studies, San Antonio concluded it needed to develop new water supplies to meet projected needs by 2020. The City of San Antonio Water Board proposed to build the Applewhite Project across the Medina River, in Bexar County, Texas to augment the city's water supply.

## II.

For this Court to grant Plaintiffs' motion, Plaintiffs must meet all four pre-requisites for preliminary injunction relief:

1. A substantial likelihood that Plaintiffs will prevail on the merits;

2. The substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted;

3. The threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to the Defendant; and

4. The granting of the preliminary injunction will not disserve the public interest. *Libertarian Party of Texas v. Fainter,* 741 F.2d 728, 729 (5th Cir.1984). Plaintiffs bear the burden of persuasion on all four factors. *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 435 (5th Cir.1981).

■ Plaintiffs seek review of the permit pursuant to the provisions of the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701–706. Plaintiffs' challenges under the CWA permitting statutes is governed by the "arbitrary and capricious" standard set forth in 5 U.S.C. § 706(2)(A). This standard of review is highly deferential. A final agency decision is entitled to a presumption of regularity. *Louisiana Envtl. Soc'y, Inc. v. Dole,* 707 F.2d 116, 118–19 (5th Cir.1983). Under subsection 706(2)(A), the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a *clear error of judgment.* In reviewing action under the arbitrary and capricious standard, the court must not

substitute its judgment for that of the agency. *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir. 1983); accord, (accord to *Avoyelles* ) *City of Houston v. FAA,* 679 F.2d 1184, 1190 (5th Cir.1982).

■ Plaintiffs' NHPA and NEPA claims are not free-standing claims and, instead, challenge the permit on the grounds that the Corps did not comply with other relevant statutes. 5 U.S.C. § 706(2)(D); *see Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown,* 875 F.2d 453, 458 (5th Cir.1989), cert. denied, — U.S. ——, 110 S.Ct. 720, 107 L.Ed.2d 739 (1990). The NHPA and NEPA create only procedural, not substantive rights. *See, e.g., United States v. 162.20 Acres of Land, Situated in Clay County,* 733 F.2d 377, 380 (5th Cir.1984), cert. denied, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 920 (1985) (NHPA); *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) (NEPA). The role of the court in reviewing an environmental impact statement prepared under NEPA is to determine whether the agency has adequately considered and disclosed the environmental consequences of its proposed action. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252–53, 76 L.Ed.2d 437 (1933).

■ Under the NHPA, the role of the court is to determine whether the agency has followed the procedures for consultation with the Advisory Council on Historic Preservation. *See 162.20 Acres,* 733 F.2d at 380; *Connecticut Trust for Historic Preservation v. ICC,* 841 F.2d 479, 484 (2d Cir.1988).

■ The judicial inquiry into the merits of plaintiffs' NEPA claim must apply a pragmatic standard which requires good faith objectivity but avoids "fly specking." *Isle of Hope Historical Association, Inc. v. U.S. Army Corps of Engineers,* 646 F.2d

215, 220 (5th Cir.1981). NEPA itself does not mandate particular results, but simply prescribes the necessary process. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The Court's rule in reviewing the adequacy of an EIS is strictly limited to determining whether plaintiffs have established by a preponderance of the evidence that the EIS is inadequate. *Isle of Hope,* 646 F.2d at 220. In determining whether the EIS contains both sufficient detail and sufficient explanation of alternatives and evidences an objective, "hard look" at the environmental consequences, the court judges the agency's compliance against a rule of reason. *Texas Committee on Natural Resources v. Marsh,* 736 F.2d 262, 266 (5th Cir.1984).

### III.

At the hearing on this preliminary injunction, Plaintiffs abandoned their argument that the permit was issued in violation of the Rivers and Harbors Appropriation Act of 1899, as amended, 33 U.S.C. § 401 *et seq.* However, Plaintiffs did urge the following three arguments. First, that the final Environmental Impact Statement prepared by Defendant United States Army Corps of Engineers violates the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, and the implementing regulations 40 C.F.R. § 1508.7, by failing to analyze and disclose the cumulative impacts of the Applewhite Reservoir project with other reasonably foreseeable future actions on the San Antonio–Guadalupe River Watershed in San Antonio Bay. Secondly, that Defendant United States Army Corps of Engineers violated section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470, by issuing the permit for the Applewhite Project before completing the procedural requirements. Protection of Historic and Cultural Properties, 36 C.F.R. § 800.1 (1989). Specifically no programmatic agreement was signed prior to the issuance of permit SWF–83–BEXAR–553. Thirdly, Plaintiffs contend that Defendant United States Army Corps of Engineers has violated § 404 of the Clear Water Act (CWA), 33 U.S.C. § 1344, by failing to comply with § 404(b)(1) guidelines codified at 40 C.F.R. Part 230. Defendant failed to analyze the impacts of the Applewhite Project in combination with "reasonably foreseeable future actions". Council on Environmental Quality Terminology and Index, 40 C.F.R. § 1508.7 (1989).

(a) Violations of NEPA OR CWA?

Essentially Plaintiffs' argument as to violation of § 4321 of the NEPA and § 404(b)(1) of the CWA is the same. Plaintiffs argue that the Environmental Impact Statement issued by Defendant U.S. Army Corps of Engineers, contains no analysis of the cumulative impact of the Applewhite Project with other reasonably foreseeable reservoir projects in the San Antonio–Guadalupe watershed.

According to the testimony of Dr. McFarland, analysis of the cumulative impacts of the Applewhite Projects with the other reasonably foreseeable reservoir projects in the San Antonio–Guadalupe watershed is possible using available data and available methodology. Nonetheless, Dr. McFarland conceded he did not make such an analysis and had no opinion what such an analysis would reveal.

Dr. McFarland testified that five potential reservoirs "have been *contemplated* and are in various stages of planning...." However, there has been no evidence that the Corps is preparing to decide anything with respect to the five reservoirs. The City Water Board has made no effort to obtain any permits from either the Corps, or the Texas Water Commission. Detail planning for other potential sites has not occurred. The Applewhite Project was approved and financed by the City of San Antonio separate from the consideration of any other potential reservoir.

Council on Environmental Quality regulations define "cumulative impact" as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other

actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

The NEPA requires consideration of cumulative effects of *proposed* and not merely contemplated, future actions. *Kleppe v. Sierra Club,* 427 U.S. 390, 407–08, 96 S.Ct. 2718, 2729, 49 L.Ed.2d 576 (1976); and *Fritiofson v. Alexander,* 772 F.2d 1225, 1242–43 (5th Cir.1985). A "proposal" exists when the agency, here the Corps, is preparing to make a decision, and the effects thereof "can be meaningfully evaluated." Council on Environmental Quality Terminology and Index, 40 C.F.R. § 1508.23 (1989). Accordingly, the Court finds that these "contemplated" reservoirs were not proposals requiring cumulative impact analysis under the NEPA. *Kleppe,* 427 U.S. at 407–08, 96 S.Ct. at 2729; *accord, Fritiofson,* 772 F.2d at 1242–43.

■ Nor did the Corps of Engineers fail to comply with § 404(b)(1) guidelines codified at 40 C.F.R. Part 230. Under section 404(a) of the CWA, 33 U.S.C. § 1344(a), the Secretary of the Army is authorized, after notice and opportunity for public comment, to issue permits for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

Section 404(b) provides that each such permit shall be based on the application of guidelines developed by the Administrator of the United States Environmental Protection Agency ("EPA"), in conjunction with the Secretary. 33 U.S.C. § 1344(b).

Section 230.10(a) EPA's Guidelines provides:

[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

Consideration of section 404 permits is governed by regulations promulgated by the Corps and codified at 33 C.F.R. Parts 320–329. Section 320.4 contains the Corps' general policies for evaluation permit applications. Under subsection (a), the Corps undertakes a "public interest review" of all permit applications, by evaluating the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Corps of Engineers General Regulatory Policies (1989), 33 C.F.R. § 320.4(a)(1).

The Corps must balance benefits which reasonably may be expected to accrue from the proposal against the proposal's reasonably foreseeable detriments. *Id.* In evaluating a section 404 permit application, the Corps considers, *inter alia,* the public and private need for the proposed project and the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposal. *Id.* at § 320.4(a)(2). Based on the testimony and the administrative record, and having found that the Corps of Engineers did evaluate the probable impact, including the cumulative impacts, of the proposed activity, the Court finds that the Corp of Engineers neither violated § 404 of the Clean Water Act, 33 U.S.C. § 1344; nor did the Corps fail to comply with § 404(b)(1) guidelines, codified at 40 C.F.R. Part 230.

### (b) Violation of NHPA?

■ Plaintiffs also contend that there was a violation of section 106 of the National Historic Preservation Act, 16 U.S.C. § 470, by issuing the permit for the Applewhite Project before completing the procedural requirements. Protection of Historic and Cultural Properties, 36 C.F.R. § 800 (1989). Specifically Plaintiffs argue that there are several rare and unique archeological historic and pre-historic sites that will be affected by the Applewhite Project and that no programmatic agreement was signed prior to the issuance of permit number SWF–83–BEXAR–553. The Corps does not dispute the fact that cultural resources have been identified in the Applewhite Project area. The public notice of the Board's permit application for the construction of the Applewhite Reservoir, dated November 23, 1982, stated:

*Cultural Resources:*

A pedestrian survey was conducted in 1981 of approximately fifty percent of

the permit area. The results of this survey indicated that fifty-seven cultural properties, representing both the prehistoric and historic periods, and including five cemeteries were located within the project area. Thirty-two of these properties were considered potentially eligible for the National Register of Historic Places. Appropriate compliance procedures with Section 106 of the National Historic Preservation act, as amended are being initiated by the COE. [A.R. 37–1319, p. 7].

Survey, testing, and evaluation of the Applewhite Project area was completed in 1984. The result of these 1981 and 1984 surveys culminated in the 1987 report, *Chipped Stone and Adobe: A Cultural Resources Assessment of the Proposed Applewhite Reservoir.* [A.R. 31–1206].

Throughout the study period the Corps and Board consulted with the Texas State Historic Preservation Office (TSHPO) with regard to the surveys and studies performed on the project area. *See, e.g.,* [A.R. 40–1368 (TSHPO comment letters on draft cultural resources report, dated 1/10/83), 33–1238 (TSHPO comment letter on Draft Phase II Report of Archeological Investigations, dated 10/1/85), 33–1245 (same, dated 7/3/86), 39–1340 (TSHPO letter forwarding critique of Three–Ring Project, dated 9/5/86) ].

Because numerous cultural resources were identified and confirmed through testing, and the effect of the Applewhite Project through the inundation of these properties would clearly be adverse, the Corps pursued the execution of a programmatic agreement to satisfy the Section 106 consultation requirements, pursuant to 36 C.F.R. § 800.13. The Corps has transmitted four draft programmatic agreements to the Advisory Council on Historic Preservation (ACHP) and TSHPO for consultation and agreement: December 23, 1988 [A.R. 33–1247, 50–1442]; June 27, 1989 [A.R. 34–1279, 34–1278]; January 16, 1990 [A.R. 33–1254, 35–1299]; and most recently on March 7, 1989.

The Corps has agreed to allow several parties to participate as interested parties. [A.R. 32–1219 (Bessie Walsh); 32–1212 (James Blackburn); 32–217 (Curtis Mahla); 32–1216 (Francis Gembler) ]. The participation of the interested parties is reflected in file 32 of the administrative record and included a meeting with those parties on August 23, 1989.

The Corps issued the permit to the Board prior to the completion of the Section 106 process. The Section 106 process has continued, however, subsequent to permit issuance on August 28, 1989, as reflected by the fact that the Corps continued to receive comments on, and circulate drafts of the PA. [A.R. 33–1254, 35–1299]. On August 28, 1989, the Corps issued the Record of Decision and permit for the Applewhite Project. The permit the Corps approved requires the Board to spend approximately twelve million dollars on environmental mitigation efforts. [A.R. 22–927]. The Corps has issued the permit *subject to* five special conditions:

1. The permittee shall insure that any off-site fill material used in construction is from a clean upland site removed from sources of contamination.

2. The permittee shall implement soil erosion prevention techniques which include properly locating waste stock piles and construction shops, stabilizing banks, and avoiding discharge into waters of the United States where practical.

3. The following measures shall be taken by the permittee prior to final closure and deliberate impoundment of the reservoir to provide mitigation for terrestrial habitat losses:

a. The permittee shall acquire for wildlife habitat mitigation the proposed 1,748 acre tract (approximately 1,319 acres of bottomland hardwood forest, 384 acres of mesquite brush and mesquite grasslands and 45 acres of pasture lands) located along the Medina and San Antonio Rivers ...

b. The permittee shall furnish for the District Engineer's approval a management plan to be implemented for the land purchased for wildlife habitat mitigation ...

4. The permittee shall fully implement and abide by all conditions set forth in

the Programmatic Agreement for cultural resources which shall be incorporated into the conditions of this permit. Prior to the incorporation of a signed PA into the permit, impacts to cultural resources shall be limited to recording, testing, and evaluation of sites for eligibility to the National Register of Historic Places.

5. [A monitoring program to ensure compliance with the foregoing].

[A.R. 03–0133].

An examination of the permit reveals that, by its terms, it restricts the actions that the Board can take prior to the execution of the PA. The permit imposes special conditions that protect and preserve the cultural resources of the project area until the PA is executed by the Corps, the ACHP, and TSHPO. Special condition 4 on page 4 of the permit provides:

> 4. The permittee shall fully implement and abide by all conditions set forth in the Programmatic Agreement for cultural resources which shall be incorporated into the conditions of this permit. *Prior to the incorporation of a signed PA into the permit, impacts to cultural resources shall be limited to recording, testing, and evaluation of sites for eligibility to the National Register of Historic Places.*

[A.R. 03–0133] (emphasis added).

Condition 3 to the permit provides that if the Board discovers "any previously unknown historic or archeological remains while accomplishing the activity authorized by the permit" it must immediately notify the Corps so that appropriate action can be taken to comply with the NHPA. *Id.*

The National Historic Preservation Act, enacted in 1966, expresses a general policy of support and encouragement of the preservation of prehistoric and historic resources by directing federal agencies to consider cultural resources in their programs and activities. 16 U.S.C. § 470 *et seq.* (1966), as amended by Act of December 12, 1980, Pub.L. No. 96–515. The Act established the National Register of Historic Places (National Register), a listing of the nation's districts, sites, buildings, struc-

tures, and objects that are culturally significant. *Id.* at § 470a(a)(1)(A).

The NHPA also created the Advisory Council on Historic Preservation, an independent federal agency charged with advising the President, Congress, and other federal agencies on matters relating to historic preservation. The Advisory Council is also responsible for the implementation of Section 106 of the NHPA, which provides in relevant part:

> [T]he head of any Federal department of independent agency having authority to license any undertaking shall, prior to the approval of any expenditure or any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. *The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking.*

*Id.* at § 470f (emphasis added).

Pursuant to its authority to promulgate regulations implementing Section 106, the ACHP has established procedures governing agency consultation, and the manner in which it provides comments of federal undertakings. *See generally* Protection of Historic and Cultural Properties, 36 C.F.R. § 800 (1989) (the Section 106 process). The federal agency must first determine whether the proposed undertaking will have an effect on historic properties and obtain the views of the State Historic Preservation Officer of the State in which the cultural resources are found to identify all historic properties that may be affected. *Id.* at § 800.4. If a property is identified that appears to meet the criteria for inclusion on the National Register, it shall be considered an eligible property for purposes of the Section 106 process. *Id.* at § 800.4(c).

If the agency determines that either there are no historic properties or that there is no effect on any such properties that were identified, and there is no timely

objection to that determination, then the project may proceed. Protection of Historic and Cultural Properties, 36 C.F.R. § 800.4(e)(b) and (d) (1989). If the agency determines there is an adverse effect, then it must notify the ACHP and consult with the State Historic Preservation Officer ("SHPO") to seek ways to reduce or avoid the effects of the undertaking on the historic properties. *Id.* at § 800.5(e).

The heart of the NHPA is the requirement that the agency afford the ACHP with "a reasonable opportunity to comment...." By regulation, the ACHP has specified three procedures that satisfy this requirement. The Corps has utilized the third option in this instance, which involves the execution of a "programmatic agreement" ("PA"). *Id.* at § 800.13(a). In developing the PA, the agency must consult with the ACHP and the SHPO. *Id.* at § 800.13(b). The ACHP, with the assistance of the agency, must arrange for public involvement in the process. *Id.* at § 800.13(c). After consideration of any public comments and reaching final agreement, the agency and ACHP may then execute the PA, thereby satisfying the agency's Section 106 responsibilities.

> An approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings carried out in accordance with the agreement until it expires or is terminated.

*Id.* § 800.13(e).

> Section 106 requires the Agency Official to complete the section 106 process prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license or permit. [However,] *the Council (ACHP) does not interpret this language to bar an Agency Official from expending funds on or authorizing nondestructive planning activities preparatory to an undertaking before complying with section 106, or to prohibit phased compliance at different stages in planning.* The Agency Official should insure that the section 106 process is initiated early in the planning stages of the undertaking, when the widest feasible range of alternatives is open for consideration.

> The Agency Official should establish a schedule for completing the section 106 process that is consistent with the planning and approval schedule for the undertaking.

Protection of Historic and Cultural Properties, 36 C.F.R. § 800.3(c) (1989) (emphasis added). Given the special conditions imposed by permit number SWF–83–BEXAR–553, the Court finds no violation of NHPA or 36 C.F.R. Part 800.

## IV.

■ After reviewing the evidence and record admitted on this motion, the Court cannot conclude that the threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to the Defendant, nor can it conclude that the preliminary injunction will not disserve the public. *Fainter,* 741 F.2d at 729.

The final Environmental Impact Statement adequately summarized the stakes of the various parties.

> Granting the permit would allow construction of the proposed project to provide an average of approximately 53,000 acre-feet of water annually (maximum annual yield of 70,000 acre-feet permitted by the Texas Water Commission) for municipal and industrial purposes. Since impoundment of this water would result in increased springflow from the Edwards Aquifer at current demand levels, the regional net water gain would average approximately 30,000 acre-feet per year. The reservoir would have a surface area of 2,500 acres and a volume of 45,251 acre-feet at the conservation pool level of 536.0 feet mean sea level. (msl). The proposed project would inundate approximately 18 linear miles (957 acres) of riparian habitat, 1,950 acres of prime farmland soils, and 8 acres of Section 404 wetlands. Relocation of approximately 95 residences, between 3 and 5 cemeteries, and several transportation arteries and utilities would be required. Estimates of inflow reduction to San Antonio Bay range from less than 1.0 to 1.8 percent.

> Denying the permit would do nothing to alleviate the projected water shortages

of the San Antonio City Water Board's service area. It would avoid the inundation of 18 linear miles of riparian habitat and 1,950 acres of prime farmland. Continued reliance upon ground water as the sole source would result in reduced Edwards Aquifer levels with an associated springflow from San Marcos and Comal Springs. No relocations of residences, cemeteries, roads, and utilities would be required. (FEIS at 1 and 2).

The Court concludes that lack of water in the future clearly discernable from the record far outweighs any threatened injury to the Plaintiffs and would be a great disservice to the public interest.

## V.

Accordingly, the Court finds, first, that there is not a substantial likelihood that Plaintiffs will prevail on the merits based on these arguments. Secondly, the Court finds that the threatened injury to the Plaintiffs does not outweigh the threatened harm the injunction may do to the Defendant, and, thirdly, that the Plaintiffs failed to show that the granting of the preliminary injunction will not disservice the public.

Plaintiffs' Motion for Preliminary Injunction is DENIED.

IT IS SO ORDERED.