SIERRA CLUB, a California corporation, and Friends of Bear Creek, a Colorado corporation, and the Denver Audubon Society, a Colorado corporation, Plaintiffs,

v.

General Henry HATCH and Colonel Stewart Bornhoft, in their capacities as the Chief Engineer and the District Engineer of the Army Corps of Engineers, an Agency of the government of the United States of America, and the City Council of the City of Lakewood, Colorado, Defendants.

Civ. A. No. 91–Z–2084.

United States District Court,
D. Colorado.

Feb. 14, 1992.

Beverly N. Ballantine, Kristen K. Olson, Littleton, Colo.; Thomas P. Quinn, Wheatridge, Colo., Ralph Ogden, Denver, Colo., for plaintiffs.

Malcolm M. Murray, Gerald E. Dahl, Robert C. Widner, William G. Pharo, Asst. U.S. Atty., Denver, Colo., for defendants.

## ORDER

WEINSHIENK, District Judge.

The matter before the Court is plaintiffs' Application For Preliminary Injunction. On November 28, 1991, plaintiffs filed a Complaint alleging that defendants violated the requirements of the National Environmental Policy Act (NEPA), 42. U.S.C. § 4321 et seq., in connection with the construction of a 27–hole golf course on approximately 450 acres of open space within Bear Creek Lake Park. Specifically, plaintiffs contend that the United States Department of the Army and the Army Corps of Engineers improperly amended the Bear Creek Lake Master Plan without the preparation of a Supplemental Environmental Impact Statement and erroneously issued a Finding Of No Significant Impact, approving the construction of the golf course. Plaintiffs seek injunctive relief. Jurisdiction is appropriate under 28 U.S.C. § 1331. On December 13, 1991, this Court denied plaintiffs' Verified Application For Temporary Restraining Order.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 604, and the agreement of the parties, the Court referred this matter to Chief Magistrate Judge Donald E. Abram for the purpose of holding a hearing and making a recommendation on plaintiffs' Application For Preliminary Injunction. Magistrate Judge Abram conducted a hearing on December 26 and 27, 1991, at which the parties presented witnesses and exhibits. On January 2, 1992, the Magistrate Judge issued a Recommendation Of United States Magistrate Judge, in which he recommended that the Application For Preliminary Injunction be denied. The Magistrate Judge concluded that plaintiffs failed to show any substantial likelihood that they would prevail on the merits. Additionally, he determined that plaintiffs failed to show that they would be irreparably harmed if an injunction were not issued, and failed to show that the threatened injury to plaintiffs outweighed the injury which entry of a preliminary injunction would cause defendants. Finally, the Magistrate Judge determined that a preliminary injunction would be adverse to the public interest.

On January 22, 1992, after the Court granted their motion for an extension of time, plaintiffs filed objections to the Magistrate Judge's recommendation. Plaintiffs filed a supplemental statement of objections to the recommendation on February 4, 1992. Additionally, plaintiffs have filed a motion requesting a supplemental hearing on their application for a preliminary injunction. The Court is required to review *de novo* all portions of the Magistrate Judge's recommendation to which objections have been filed. *See* 28 U.S.C. § 636(b).

The Court has done so, and having considered carefully the Magistrate Judge's Recommendation, the objections, and the record, agrees with the Magistrate Judge's conclusion that a preliminary injunction should not be issued. Although the Court has some questions concerning the Magistrate Judge's determination that plaintiffs would not be irreparably harmed should their motion be denied, it is not necessary to reach that issue. The Court is satisfied that the Magistrate Judge correctly determined that there is not a substantial likelihood that plaintiffs will prevail on the merits. Therefore, the Court hereby accepts and adopts the Magistrate Judge's Recommendation as it pertains to consideration of the merits of plaintiffs' Complaint. Because there is not a substantial likelihood that plaintiffs will prevail on the merits, plaintiffs' application for preliminary in-

junction will be denied. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). Accordingly, it is

ORDERED that plaintiffs' Application For Preliminary Injunction is denied. It is

FURTHER ORDERED that plaintiffs' Motion For Supplemental Hearing On Plaintiffs' Application For Preliminary Injunction is denied. It is

FURTHER ORDERED that defendants' Motion For Summary Judgment is set for hearing on Wednesday, April 9, 1992, at 8:30 a.m. in Courtroom C–502, United States Courthouse, 1929 Stout Street, Denver, Colorado.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ABRAM, Chief United States Magistrate Judge.

THIS MATTER came on for hearing upon plaintiffs' Motion for a Preliminary Injunction and was heard by Chief Magistrate Judge Donald E. Abram, pursuant to the Order of United States District Judge Zita L. Weinshienk. A hearing was conducted on December 26 and 27, 1991, at which all parties were represented and presented witnesses and exhibits. Citation herein to exhibits introduced by the plaintiffs will be by number. Citations to exhibits introduced by the defendants will be by letter. Citations to the administrative record, Defense Exhibit A, will also recite the record index number (e.g.: "Exhibit A; AR 138").

Based upon the testimony and evidence introduced into the record, the Court makes the following findings of fact, conclusions of law, and recommended order:

## FINDINGS OF FACT

1. On August 22, 1991, Colonel Stewart H. Bornhoft, Engineers ("Corps"), issued a Finding of No Significant Impact (FONSI) with respect to a change in land use to allow construction and operation of a 27–hole golf course on approximately 407 acres of land at the Bear Creek Lake Park Project. The Bear Creek Lake Park Project is owned by the Corps of Engineers and is located in Jefferson County, Colorado. The City of Lakewood ("Lakewood" or "City"), the non-federal entity currently leasing and managing Bear Creek Lake Park, proposed a project consisting of (1) a 27–hole golf course, (2) 96 acre-feet of water made available each year by Lakewood in the South Platte River as near the Colorado–Nebraska state line as practicable, and (3) an annual contribution by Lakewood of $1,000 to the National Fish and Wildlife Foundation, for protection and restoration of threatened and endangered species habitat on the Platte River in central Nebraska. This Project is known as Fox Hollow at Lakewood Golf Course. The FONSI issued by Colonel Bornhoft states his finding that the mitigation, the proposed federal action would not have any net significant adverse effects on the environment and that approval of a change in land use at Bear Creek Lake Park to allow construction and operation of a golf course would not constitute a major federal action significantly affecting the quality of the human environment and that, accordingly, an environmental impact statement would not be prepared. Exhibit A; AR 138, paragraph 1.

2. The basis for the August 22, 1991 FONSI was a final environmental assessment for the Fox Hollow at Lakewood Golf Course Project dated August, 1991, and issued by the Corps. A copy of the final environmental assessment ("Final EA") was introduced into evidence as a part of defendants' Exhibit A, at Administrative Record Index No. 138.

3. The August, 1991 Final EA consists of the following documents:

   a. a 13–page assessment prepared by the Corps;

   b. an environmental assessment prepared for Lakewood by Harner & Associates and submitted to the Corps in June of 1990 ("Harner EA");

   c. a December, 1990 draft environmental assessment prepared by the Corps ("Draft EA") and;

d. a July, 1991 supplemental environmental assessment prepared by Lakewood's Department of Community Resources ("Supplemental EA"). The Supplemental EA provided Lakewood's responses to requests for clarification from the Corps, to public and agency comments received on the previous two documents, and to questions and issues raised during a public meeting and workshop held on June 6, 1991, by the Corps. The Supplemental EA also contained additional technical studies and research.

The Final EA of August, 1991, contains three appendices: (1) Lakewood's July, 1991 Supplemental EA, including the City's commitments for mitigation and protection of resources of substantial public concern (Appendix A); (2) a draft memorandum of agreement among the Corps, Lakewood the Advisory Council on Historic Preservation, and the Colorado State Historic Preservation Officer regarding the Pioneer–Union Ditch (Appendix B); and (3) a discussion of public coordination and a comment/response section for all comment letters received during the comment period for the Draft EA, along with a transcript of the June 6, 1991 public meeting (Appendix C).

4. In December of 1990, the Corps issued a draft environmental assessment ("Draft EA") and Draft FONSI. Exhibit A; AR 69.

5. The Corps' December, 1990 Draft EA incorporated Lakewood's June 1990 Harner EA by reference. This Draft EA was circulated for a 30–day period to interested federal and state agencies and to the public. Exhibit A; AR 69–71. The comment period for written comments ended on January 23, 1991, but later was extended until June 20, 1991.

6. In response to the Draft EA, numerous comments were received from interested federal and state agencies, from individuals, and from public organizations. Approximately 205 individual comment letters were received. Exhibit A; AR 72.1–72.205. The Sierra Club's Rocky Mountain Chapter provided preprinted postcards to its members. These postcards contained a number of reasons for objecting to the proposed golf course. Approximately 220 individuals submitted these cards during the comment period. Exhibit A; AR 73.

7. In response to agency and public comment, the Corps conducted an afternoon public workshop and evening meeting on June 6, 1991, at Green Mountain High School in Lakewood, Colorado. Approximately 50 persons attended the workshop which was designed for "one-on-one" discussions between interested members of the public and officials from both the Corps and Lakewood. Approximately 170 persons attended the evening public meeting and approximately 50 persons testified. Testimony of Gerard E. Mick. A transcript of the evening public meeting was prepared and made a part of the Final EA. Exhibit A; AR 138, Appendix C.

8. Written comments were accepted during the June 6 public meeting, and the period for comments was extended for an additional two weeks, to and including June 20, 1991. Testimony of Gerard Mick.

9. In response to all written and oral public and agency comments, Lakewood prepared its July 1991 Supplemental EA and submitted it to the Corps. Also in response to public and agency comment, the Corps prepared its Final EA of August, 1991, which incorporated the Supplemental EA prepared by Lakewood. Testimony of William Jewell; testimony of Gerard Mick.

10. Appendix C to the Corps' August, 1991 Final EA (Exhibit A; AR 138) contains a copy of all of the individual comment letters received by the Corps on the Draft EA and FONSI and, in a side-by-side format, also contains the detailed responses by the Corps to each substantive comment.

11. The agency and public comments at public hearings and in writing on the Draft EA and Draft FONSI, newspaper articles and comments, as well as the testimony at the December 26 through 27 hearing before this Court, establish a disagreement between golf enthusiast and nature users of the park. The plaintiffs claim that the construction of a golf course will significantly affect the quality of the environ-

ment. The three areas of the environment raised by the pleadings and the court hearing are:

   a.  the project's potential impact on wildlife, specifically a small herd of elk and one nest of red tailed hawks.

   b.  the project's potential impact on ground and surface water quality by the run off of pesticides and chemicals from the golf course and

   c.  the project's potential impact on threatened and endangered species.

12. As to the impact on wildlife, the evidence and testimony presented at the hearing and contained in the record demonstrated no major net adverse impacts to wildlife in the project area as a result of project construction and operation. LeRoy Carlson, Colorado State Supervisor for the United States Fish and Wildlife Service, stated his belief that project construction would adversely affect wildlife, but admitted that neither he nor his agency had made any study of either the wildlife or supporting habitats present at the project site or of the nature and kind of such impacts and that he could not contradict the conclusions in the Supplemental EA regarding wildlife impacts. Carlson has been supervisor in Colorado since 1988. He was not familiar with the history of use of the park, its management or of the master plans. Carlson's letter of January 25, 1991, (Exhibit 1), attached a letter dated November 9, 1966. The letter of 1966 assumes that the management of the park will be the Colorado Department of Game, Fish and Wildlife. The subsequent EIS and Supplemental EIS establish that the management of the park was the Colorado Department of Parks and Recreation because 80% of the park was devoted to recreation. In the attached letter to Exhibit 1, the Fish and Wildlife found that "fur animal populations are insignificant." The 1976 Master Plan, AR 2, lists no wildlife bigger than a beaver and coyote. That plan also called for baseball fields, a football field, horseshoe pits and other intensive games in the area of the proposed golf course. AR 2, p. 7–7. At page 3–13 it calls for outdoor games as a part of the design

criteria and at page 8–14 for outdoor games of all types. The Vegetation Management Plan, AR 3, states at page 12, "[n]o big game animals inhabit the Bear Creek area. Mule deer, however may drift onto Mt. Glennon and along the Bear and Turkey Creek drainages to browse." The 1980 Master Plan, AR 5, lists no elk or mule deer on the confirmed list of mammals on the Bear Creek Project. Table 13a, AR 5. The Supplemental Environmental Assessment AR 138, pp. 41 & 49 and the Final Assessment Exhibit 6, p. 7 address the effect on the mule deer. Whether the mammals are called mule deer or elk, the studies since 1966 establish that the mammals are mobile and come into the Bear Creek area at their discretion. The plaintiffs have presented no evidence that the golf course would eliminate mule deer or elk in the Bear Creek area. The only other concern expressed about wildlife was the one nest of red tail hawks. The 1977 Vegetation Management Plan, AR 3, p. 13 established that the red tail hawk was present before the building of the Bear Creek Dam. Despite that construction which was more extensive than the construction of a golf course, the red tail hawk continues to exist at the park. If the two hawks are disturbed by the construction, the FONSI, AR138, p. 7 states that the birds would continue to nest in the area. There is no evidence contrary to the study since the red tail hawk has existed in the area since the 1977 study. The testimony of defendant Lakewood's witness Bruce Snyder established that the Corps had analyzed both the existing wildlife and habitat resources at the project site and the potential impacts of the project on those resources. Mr. Snyder testified that he had conducted a study of wildlife and supporting habitat present at the project site and the probable impact of project construction, and that he had concluded that the net impact to wildlife, with the proposed mitigation measures, would not be substantial. Mr. Snyder testified that, in certain cases, the project construction and associated mitigation measures would enhance the attractiveness of the area to certain species. He testified that he project would not cause loss of any

wildlife species currently using the project site and would probably lead to its use by a greater variety of species than at present. Mr. Snyder's studies and conclusions were made a part of Lakewood's July, 1991 Supplemental EA and made a part of the Corps' August, 1991 Final EA. See Exhibit A; AR 138, Appendix A, at pp. 39–50. There is no evidence of any harm to the deer, elk or red tailed hawk if a golf course is built or any significant affect to the quality of the environment.

13. As to the issue of water quality if a golf course is developed, the evidence and testimony at the hearing and in the record demonstrated that no major adverse effect upon surface or groundwater quality will be caused by the proposed project construction and operation. Testimony of Bruce Snyder and Gerard Mick. The analysis of these impacts is detailed in Lakewood's July, 1991 Supplemental EA. Exhibit A; AR 138, Appendix A, at pp. 14–38. The testimony of Bruce Snyder established that the Pesticide and Fertilizer Application Management Plan contained in the Supplemental EA at pages 68–78 and the Soil and Water Quality Protection Program contained in the Supplemental EA at page 93, in conjunction with existing site soil conditions and provisions for riparian buffer zones, would adequately protect ground and surface water quality. In particular, Mr. Snyder's testimony established that the impact of the use of specific pesticides and fertilizers registered by EPA for use on golf course turf grass had been individually studied and evaluated.

After the rough draft of the Environmental Assessment, Vern Helbig and two others, met with Mr. Jewell of Lakewood at the Bear Creek Park. The EPA had by a letter of January 23, 1991, Exhibit 8, recommended the Corps consider an 18 hole course and a supplemental EIS. After the meeting, a letter drafted by Helbig and signed by Robert DeSpain, Exhibit 9, indicated that it needed more information concerning the use of chemicals on the course. It further expressed a belief that a supplemental EIS would be appropriate to determine whether the conversion of 450 acres of open space was to the best interest of the public. Based upon the concern about the chemicals, a management letter was written on May 15, 1991 describing the Management Plan for Pesticide and Fertilizer Application on Fox Hollow at Lakewood Golf Course. AR 119. It took into consideration the Cape Cod study, Pennsylvania State University study and Florida study. Nearly 20% of the Supplemental EA, Exhibit A; AR 138 addresses the chemical issue raised by EPA. The following pages in the SEA are directed to that issue: 14–38, 68–78, and 93. The EPA has not raised the issue after the supplemental EA and no evidence was presented at the hearing that there would be any environmental impact.

14. The environmental impact on five possible endangered species was raised by the Fish and Wildlife letter. Carlson did not testify why there was concern about the five species. The Vegetation Management Plan of 1977, AR 3, list the flora at pages 8 and 9 and the birds at page 13 which were identified in the Bear Creek area. None of the fauna or birds listed in the Carlson letter are listed as being present. A botanical consultant, William Jennings, was retained to do a rare plant study. On August 22, 1991 he found no rare flora. AR 125. The evidence and testimony at the hearing and in the record demonstrated that project construction will have no impact on threatened and endangered species associated with the park and project site nor to such species located downstream on the Platte River. The Corps evaluated the potential existence of the following threatened or endangered species at the project site: black-footed ferret, bald eagle, swift fox (although not a listed threatened or endangered species in Colorado), and Ute ladies tresses orchid (a candidate species for listing). Exhibit A; AR 108. By letter dated May 9, 1991, the U.S. Fish and Wildlife Service concurred in the Corps' determination of "no effect" with respect to the black-footed ferret and Ute ladies tresses orchid. Exhibit A; AR 118. The Supplemental EA evaluated the existence of all four species at the site and, based upon actual field study, concluded

none were present. Exhibit A; AR 138; Appendix A, at pp. 39–41 and 54. By letter dated January 25, 1991, the U.S. Fish and Wildlife Service initially indicated that the following listed threatened or endangered species may be present at the project site: least tern, whooping crane, piping plover, American burying beetle, and the Western prairie fringed orchid. Exhibit 1, p. 2; Exhibit A; AR 88, p. 6. With respect to the species, Lakewood, the Corps, and the U.S. Fish and Wildlife Service held informal consultations in August, 1991. These consultations resulted in a decision by Lakewood to amend the project to avoid potential downstream impacts to endangered species by entering into a lease for the release of 96 acre-feet of water to the South Platte River annually near the Colorado–Nebraska state line and an annual contribution of $1,000 to the National Fish and Wildlife Foundation, for restoration of threatened and endangered species habitat on the Platte River in Central Nebraska. Exhibit A; AR 135–37. In testimony on December 26, LeRoy Carlson, Colorado State Supervisor for the U.S. Fish and Wildlife Service, confirmed that the project would have no impact on listed threatened or endangered species. Plaintiffs' Exhibit 15, a letter to the City from Mr. Carlson, confirmed the absence of "adverse effects to listed species likely to otherwise result form construction and operations of the Foxhollow (sic) Golf Course."

15. Plaintiffs' witness James Hammett testified it was his opinion that the project would be located in the most ecologically "sensitive" portion of Bear Creek Lake Park. However, Mr. Snyder testified that, after study of the site, the project's location occupies a Park location which is predominately characterized as a low-quality wildlife habitat and not among the most ecologically important areas of the Park. This conclusion is supported by the Final EA. Exhibit A; AR 138, Appendix A at pp. 39–60.

16. The evidence and testimony at the hearing and in the record established that, while development of the golf course project will preclude some dispersed recreational uses of that portion of Bear Creek Lake Park devoted to the course (407 acres), the remaining 83% of the parks, 1976 acres, would remain available for all recreational uses which are presently being made of the park, including hiking, bicycling, jogging, picnicking, birdwatching, general wildlife observation, and horseback riding. Testimony of William Jewell.

17. The U.S. Fish and Wildlife Service has taken the position that a supplement to the 1977 environmental impact statement for the Bear Creek Lake Park Project (Exhibit A; AR 4), or an amended Fish and Wildlife Coordination Act report on the Project under 16 U.S.C. § 661, et seq. is required before approval or construction of the proposed golf course may occur. This position is based upon the theory that golf course uses are not within the scope of the term "general recreation," as that term is used in the 1966 Fish and Wildlife Coordination Act report and in the 1971 and 1977 environmental impact statements on the Bear Creek Lake Park Project. Testimony of LeRoy Carlson; letters from U.S. Fish and Wildlife Service to the U.S. Army Corps of Engineers, Exhibits 1 and 2; Exhibit A; AR 105 and 118. The Corps concluded that neither a supplemental EIS nor an amended Fish and Wildlife Coordination Act report is required for the Fox Hollow at Lakewood Golf Course project. Exhibit A; AR 109. Bruce Snyder testified that he had conducted scientific studies of the project site, including an inventory and evaluation of existing wildlife species and habitat values, the impact of course construction and operation upon those values, and the effect of planned mitigation measures. Mr. Snyder's conclusions, which were, along with his studies and analysis, made a part of the July, 1991 Supplemental EA prepared by Lakewood, were that course construction and operation would affect the diversity, number, and population of various wildlife species, but that long-term wildlife values in the project area were likely to be enhanced as a result of the project. This testimony was not refuted by any scientific testimony presented by the plaintiffs. The position of the Corps with respect to whether a golf course project

falls within the term "general recreation," as that term is used in the 1966 Fish and Wildlife Coordination Act report and the 1971 and 1977 environmental impact statements is that golf course uses are contemplated within that term. Testimony of Gerard Mick; Exhibit A; AR 109. Mick further testified at the hearing that 18 golf courses have been developed in conjunction with Corps projects. One such project is the Kennedy golf course at the base of Cherry Creek Reservoir. Cherry Creek flows from the outlet of Cherry Creek Reservoir immediately through Kennedy Golf Course and then on through the city of Denver to the Platte River. The Court would note that no apparent environmental impact has apparently resulted from the chemicals used to fertilize Kennedy Golf Course. Although there was no testimony as to the location of Kennedy Golf Course, it is readily seen from the Cherry Creek Dam road at the top of the dam, I-225 at the base of the dam and from Havana Ave as it crosses Cherry Creek.

18. The Draft EA evaluates alternatives to the proposed action. Exhibit A; AR 69, pp. 2–3. The Final EA (Exhibit A; AR 138) evaluates alternatives at pp. 4–5 of the portion assessment prepared by the Corps and at pp. 5–9 of the July, 1991 Supplemental EA. The Court finds that this analysis and discussion of alternatives to the proposed action was sufficient to enable the Corps to make a decision with respect to the proposed action.

19. The Court finds that, while the evidence and testimony taken at the hearing and in the record demonstrated that there is opposition to the golf course project, both the opponents of the project and its supporters have had ample opportunity to appear before the City and the Corps to make their views known, orally and in writing. The City Council of the City of Lakewood, acting in open session, adopted several resolutions concerning the golf course project, including Resolution 90–38 on March 26, 1990, Resolution 90–73 on May 29, 1990, Resolution 91–13 on January 28, 1991, Resolution 91–14 on January 28, 1991, Resolution 91–107 on August 26, 1991, Ordinance 0–91–46 on August 26,

1991, and Resolution No. 91–148 on December 16, 1991. In addition, the golf course project has been the subject of approximately 19 public city council meetings, hearings, or study sessions, as described in Exhibit 3 to the Verified Answer of Defendant City Council of the City of Lakewood. At the public meeting of the city council on January 28, 1991, a public hearing roster was signed by persons desiring to speak or voice an opinion. The roster provided for a yes or no by the person. AR 80. Exhibits 19 and 20 show an active participation in the newsmedia as well as the issue becoming a political issue during the recent city council elections. Notices of the June 6, 1991 were sent to all persons who had corresponded with the Corps or had signed up at the city council meeting. Interest groups were also notified by mail. Exhibit 20. Formal notice was also given through the newspapers. Exhibits 19 J & K. In addition to receiving over 400 individual comments since issuance of the Draft EA in December, 1990, the Corps conducted a public workshop and meeting on June 6, 1991, at which an additional 170 persons were in attendance. The Court finds that the public involvement encouraged and made possible by the Corps and the City was adequate and appropriate to the level of public controversy surrounding the project.

20. In testimony at the hearing, Vern Helbig, a part-time employee of the Environmental Protection Agency who was subpoenaed to attend and give evidence on behalf of the plaintiffs, testified that the EPA position is that a supplemental environmental impact statement should be prepared for the golf course project, EPA had expressed this position in a letter to Gerard Mick dated January 23, 1991 (Exhibit 8; Exhibit A; AR 72.178), and in a letter to William Jewell dated February 1, 1991 (Exhibit 9). However, other than the testimony of Mr. Helbig on December 26, 1991, EPA has expressed no opinion on the subject subsequent to the issuance of the Final EA and FONSI on August 22, 1991, and no opinion at all in writing. Further, the concerns expressed by the EPA in its letters of

January 23, 1991 and February 1, 1991 have been addressed in the Final EA. Those concerns included analysis of alternatives, impact on wetlands and riparian vegetation, water supply for the project, surface runoff and potential groundwater contamination.

21. The evidence and testimony in the record and at the hearing demonstrated that the elected City Council of the City of Lakewood acted over a long period of time to consistently approve development of the Fox Hollow at Lakewood Golf Course, taking those actions in open session and in the context of vigorous public comment and debate by citizens and interested agencies. While the volume of such comments was high, the positions were clearly divided between those favoring the project and those opposing it. The Lakewood City Council has, as its elected duty, the obligation to make a decision, and it has done so. The Court finds that the testimony of ex-councilpersons Norma Beard and Dorothy Wisecarver is merely illustrative of the fact that opinion on the subject is divided. However, the evidence showed that all of the votes taken by the City Council were heavily in favor of the project, often being unanimous. The Court finds that development of the project is in the public interest, as that interest is legitimately defined by the consistent actions of the elected representatives of the residents of the City.

22. Based upon the evidence and testimony at the hearing and in the record, the Court finds that irreparable injury to the interests of plaintiffs will not occur if project construction takes place. There was no evidence presented by any of the witnesses for the plaintiff of any environmental impact. Each had a personal desire to maintain the park in its present condition. Each had previously indicated that position in writing and some orally at the various hearings. The two city councilpersons testified that since 1982 it has been public record that the city of Lakewood was considering a golf course. Newspaper reports support the testimony of the councilpersons. Two witnesses testified that they rode horses in the park and enjoyed nature along the creek area. Neither testified how the golf course would create an environmental impact other than a fear that conditions might change. The plaintiffs apparently rest the case on Hammett. Hammett is an employee of the National Park Service. Counsel requested to qualify Hammett as an expert. He is a natural resource specialist and is involved in the EA and EIS process. He also is a member of Sierra Club and Friends of Bear Creek. His wife does work for the Audobun Society. He testified the park was 15 minutes from his home and that he enjoyed walking along the creek. His final testimony was an emotional plea to maintain the status quo. He expressed concern about the one hawk nest. On cross-examination, he was not familiar with Corps regulations nor did he testify as to any improper procedure or conclusions by the Corp. He gave his personal opinion that a supplemental EIS should be done because the time period between the Supplemental EIS in 1977 and the EA of 1991 were too distant in time. He further argued that an alternative was to place the golf course within another place in the park. *Werth v. Makita Electric Works, Ltd.*, 950 F.2d 643, 647–648 (10th Cir.1991) discusses the qualifications of an expert. The court states "[T]he touchstone of admissibility is helpfulness to the trier of fact." Hammett provided no facts to support any opinion. He provided no studies nor had he reviewed the Corps records. He provided personal opinions which were clearly tempered by his own emotional and personal feelings. His testimony was of little value except for the purpose of expressing his own personal feelings. The testimony of the plaintiffs lack any scientific or factual evidence to support their claim. The testimony of the plaintiffs was primarily concerned about 3 acres of riparian land and .5 acres of wet land of the 407 acres. The remaining area is dry land presently undeveloped. The Court finds that the testimony, rather than establishing irreparable injury and significant impact on the environment, instead establishes that the plaintiffs' interest is in retaining present recreational uses of a small portion of Bear Creek Lake Park.

23. Lakewood has entered into a contract for construction of the golf course. Exhibit F. By change order dated December 26, 1991 (Exhibit G), Lakewood's liability in the event an injunction halts course construction on or before January 6, 1992, is limited to a maximum of $78,000. In the event golf course construction is halted after January 6, 1992, Lakewood's liability is not limited to that amount.

24. The project proposal, as approved by the Corps, includes significant mitigation features and commitments, including 96 acre-feet of water released annually to the South Platte River near the Colorado–Nebraska state line (Exhibit A; AR 137), a wildlife protection and mitigation plan, a vegetation protection and mitigation plan, a soil and water quality protection program, and a recreation mitigation plan, and a pesticide and fertilizer application management plan—all described at pages 79–94 of the Supplemental EA prepared by Lakewood and incorporated as part of the August, 1991 Final EA (Exhibit A; AR 138).

## CONCLUSIONS OF LAW

1. In order to prevail in their request for a preliminary injunction, the plaintiffs in this case must show all of the following:

  a. a substantial likelihood that they will prevail on the merits of the case;

  b. that they will suffer irreparable injury unless the preliminary injunction is issued;

  c. that the threatened injury to the plaintiffs outweighs whatever damage the preliminary injunction may cause defendants;

  d. that the preliminary injunction, if issued, would not be adverse to the public interest; and

  e. that plaintiffs' lack an adequate remedy at law.

*Lundgrin v. Claytor,* 619 F.2d 61 (10th Cir.1980); *Planned Parenthood Federation of America v. Bowen,* 680 F.Supp. 1465, 1467 (D.Colo.1988) (Weinshienk, J.)

2. The Court concludes that plaintiffs have not shown any substantial likelihood that they eventually will prevail on the merits of the case. The standard by which the Corps decision must be measured is a review of the record to determine if the Corps acted in an arbitrary and capricious manner. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Sierra Club v. Hodel,* 848 F.2d 1068 (10th Cir.1988); *Sierra Club v. Lujan,* 949 F.2d 362, 365–366 (10th Cir.1991). The evidence and testimony presented at the hearing and contained in the record demonstrate that the Corps has taken the required "hard look" at the environmental consequences of the proposed action in this case. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). Having so found, this Court cannot interpose itself in place of the agency decision maker. *Id.* This Court's review of the record reveals that the proposed project, with the project's associated mitigation features, will no result in any significant adverse impact upon wildlife resources of the project area, upon threatened or endangered species, or upon ground or surface water quality. No other significant environmental impacts or effects of concern are demonstrated by the record or the testimony.

Further, there has been no showing of irreparable harm if an injunction is not issued. As previously found in this opinion, there is no showing of irreparable harm to the environment. The evidence, in fact, would show some benefit to small animals and foul by the watering ponds and turf in an area which is now dry. Carlson testimony; FONSI, AR 138, p. 8; Supplemental EA, p. 54–55.

3. The Court finds that the Corps did not act arbitrarily or capriciously in concluding that golf course uses are reasonably included within the term "general recreation," as that term appears in the 1966 Fish and Wildlife Coordination Act report prepared for the Mt. Carbon Dam Project (now the Bear Creek Lake Park Project) under 16 U.S.C. § 661, *et seq.* All of the planning and environmental review documents in the record subsequent to the 1966 report indicate that intensive forms of recreation were contemplated for the pro-

posed project location, and it was reasonable for the Corps to conclude that golf course uses fall within this definition. Further, no additional or amended Fish and Wildlife Coordination Act report may now be required because 16 U.S.C. § 662(h) provides an exception to the provisions of the Fish and Wildlife Coordination Act for "activities for or in connection with programs primarily for land management and use carried out by federal agencies with respect to federal lands under their jurisdiction." This section exempts land management activities of federal agencies, including the Corps, when undertaken subsequent to initial project construction. See Senate Report No. 1981, 1958 U.S.Code Cong. and Admin.News, p. 3446.

4. Finally, in complying with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., by assessment and FONSI, receiving public comment on those documents and issuing a final environmental assessment and FONSI, this Court finds that the Corps of Engineers has satisfied the reporting requirements of NEPA, therefore satisfying as well the reporting requirements of the Fish and Wildlife Coordination Act. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 356 (8th Cir.1972); *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404 (W.D.Va.1973), *aff'd*, 484 F.2d 453 (4th Cir.1973).

5. This Court finds that the Corps, as the lead agency for review of the proposed project, had the authority to determine whether a supplemental environmental impact statement should be prepared. The Court further finds that it was neither arbitrary nor capricious for the Corps to determine, after conducting the environmental assessment process, that a supplemental environmental impact statement was not necessary or required. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Sierra Club v. Lujan*, 949 F.2d 362, 366 (10th Cir.1991). While the Environmental Protection Agency and the U.S. Fish And Wildlife Service have indicated in the record their preference that an environmental impact statement or supplement be prepared, neither of those agencies produced any study, analysis or other evidence in support of their position. The Court finds that, while the Corps had an obligation to consider such studies if produced by those agencies it was authorized to make its own decision with respect to the agencies' recommendation. *Lake Erie Alliance for Protection of Coastal Corridor v. Army Corps of Engineers*, 526 F.Supp. 1063 (W.D.Pa.1981), *aff'd mem.*, 707 F.2d 1392 (3d Cir.1983), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). In light of the fact that EPA and the U.S. Fish and Wildlife Service conducted no studies and brought no independent evidence or data to light but instead merely recommended that an EIS be prepared, and in view of the fact that the Corps did address what comments those agencies did make relative to the project, the Corps' action in electing not to prepare a supplemental environmental impact statement was not arbitrary or capricious. The Court also finds that an EIS was not required merely by virtue of the passage of time since preparation of the 1977 supplemental environmental impact statement. *Coker v. Skidmore*, 941 F.2d 1306, 1310 (5th Cir. 1991) (passage of time does not require supplement to EIS).

6. Public "scoping," as defined by NEPA and its implementing statutes, is not required prior to the preparation of an environmental assessment. *See* C.F.R. § 1508.-25. Instead, scoping is only required after it has been determined that an environmental impact statement must be prepared. Regulations adopted by the Council on Environmental Quality in 1986 have not changed this rule. 40 C.F.R. Part 1500.

7. The Court finds that there is no evidence in the record that irreparable injury to wildlife, threatened or endangered species, ground or surface water quality, will occur as a result of project construction and operation. The evidence demonstrated that the most important environmental values in the area affected by the project would remain after construction of the golf course and that while the nature and kind of vegetation and wildlife may change, the Court concludes that such changes do not

constitute irreparable harm. Finally, while certain recreational uses presently being made of the project lands would be displaced by golf course uses, such recreational activities are already available on other portions of Bear Creek Lake Park and in other metropolitan Denver locations, according to the testimony of the plaintiffs' witnesses themselves. Accordingly, the Court concludes that no irreparable injury will occur as a result of project construction and operation.

8. The Court concludes that the threatened injury to the plaintiffs does not outweigh the damages which entry of a preliminary injunction, if granted, would cause the defendants. Since, as described above, no irreparable injury to the plaintiffs has been proved, there is no compelling evidence, by any standard, of threatened injury to the plaintiffs. No evidence was presented during the hearing that any of the witnesses or the persons whom they represent would be prohibited from continuing to use the riparian area for walking, riding or horseback riding during the construction phase. Most of the construction will be in the 400 acres of dry grassland. In contrast, the City has demonstrated a legitimate interest in pursuing construction of the project as permitted and would suffer provable damages in the event project construction was halted or delayed by the issuance of a preliminary injunction. In the event an injunction was imposed prior to January 6, 1992, Lakewood's damages would be a minimum of $38,000 and a maximum of $78,000. In the event a preliminary injunction was imposed after January 6, 1992, Lakewood's damages, while difficult to calculate, would be considerable, including the cost of terminating the contract once construction has begun.

9. The Court finds that the preliminary injunction, if issued, would be adverse to the public interest. The public interest is here defined by the actions of the Lakewood City Council, which, consistently and over a long period of time, approved the development of the project. These actions of the Council, as demonstrated by evidence in the record, are entitled to serious consideration as evidence of the public in-

terest, particularly in light of the fact that plaintiffs' evidence did not establish that the public interest was to maintain the subject area in its present state.

IT IS THEREFORE RECOMMENDED that plaintiffs' request for preliminary injunction be denied.