82 F.3d 418
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PURE WATERS, INC., Plaintiff-Appellant,
v.
MICHIGAN DEPARTMENT OF NATURAL RESOURCES et al., Defendants-Appellees.
 No. 95-1498.
 United States Court of Appeals, Sixth Circuit.
 April 15, 1996.
 
 Before: BOGGS and DAUGHTREY, Circuit Judges, and MATIA, District Judge.*
 PER CURIAM.
 
 
 1
 The plaintiff, Pure Waters, Inc., is a citizens' group comprised largely of people residing near Linden Park in Birmingham, Michigan. Pure Waters appeals the district court's refusal to enjoin construction of an underground sewage retention treatment basin in the park. It claims that the defendants, the Michigan Department of Natural Resources, the Oakland County Drain Commission, The City of Birmingham, and various other officials, violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331 et seq., by failing to evaluate adequately the basin's ultimate effect on the water quality of the Rouge River, into which it is designed to drain and, further, that the defendants violated the Michigan Environmental Protection Act (MEPA), M.C.L. §§ 691.1201 et seq., by instituting a project that will "pollute, impair or destroy" the environment. The district court held that the Michigan Department of Natural Resources had complied with the procedural mandates of NEPA and that the plaintiff had failed to establish a prima facie case of "impairment" under MEPA. The court therefore declined to issue an injunction. We find no error and affirm.
 
 FACTUAL BACKGROUND
 
 2
 This case had its origins in an action filed by the Environmental Protection Agency in 1977 under the Clean Water Act, 33 U.S.C. §§ 1251 et seq., against the city of Detroit and some 40-odd other communities in the Rouge River watershed in Eastern Michigan. At that time (and possibly to date), the Rouge River was one of the most polluted rivers in America, and the project at issue here, among others, was designed to clean up the Rouge. In the case of defendant City of Birmingham, the challenge was to ameliorate the discharge of untreated sewage and storm water into the river at 33 outflow points on "wet days," when the city's combined sewage and storm system could not handle the volume produced by heavy rains.
 
 
 3
 In 1989, the Michigan Water Resources Commission issued a "national pollution discharge elimination system permit" to the City of Birmingham that required the control of its combined sewer overflows by 1997. The permit established three phases for the eradication of the damage to the Rouge River caused by untreated sewage. In the first stage, the city would operate, repair, and maintain existing facilities to minimize the discharge. In the second stage, the city would control combined sewer overflows to eliminate discharge of raw sewage and protect the public health by 2005. Finally, in a third stage, the city would add additional controls, if necessary, to comply with water quality standards at times of discharge into the river.
 
 
 4
 The Linden Park underground basin was designed to hold excess sewage during heavy rains until the sewer system again has the capacity to carry it to the Detroit sewage plant, as occurs on normal or "dry days." However, during extremely heavy rains, estimated to occur six to nine times a year, even the new retention basin would not be able to hold all the sewage. Therefore, after "primary" treatment, which includes skimming, settling, and disinfection with sodium hypochlorite (a five percent chlorine solution), the excess sewage would be released into the river at Linden Park, rather than at the 33 outflow points presently used. The project would reduce overall discharge into the Rouge River from 222 million gallons annually to 43 million gallons, and that overflow would be treated before it was discharged.
 
 
 5
 When challenges to the remedial plan developed, Judge Feikens took jurisdiction over all permit questions at the request of three of the Rouge River watershed communities, including Birmingham. He appointed Jonathan Buckley, a University of Michigan professor, as court monitor to negotiate a settlement as the administrative hearings progressed before the Michigan Water Resources Commission. In June 1991, a settlement agreement included revision of the original 1989 permit.
 
 
 6
 In 1992, the defendants sought federal and state loans for the basin project and received engineering proposals. The Birmingham City Commission appointed a citizens' committee to hold public hearings on the proposed basin. After considering the project's impact, as well as the impact and cost of alternatives, the citizens' committee recommended construction of the basin. After the Michigan Department of Natural Resources notified the city in 1993 that the basin met the permit's requirements, the City Commission approved the plan. In 1994, the Department completed an environmental assessment, concluding that the basin would have no significant long-term impact on water quality, and that the environmental benefits of the basin outweighed the short-term adverse effects. Bonds were issued by the city to finance the project and construction began in December 1994.
 
 
 7
 At about the same time, Pure Waters filed an amended complaint in district court, seeking to block construction of the Linden Park retention basin. The district court denied requests by Pure Waters for both a temporary restraining order and a preliminary injunction, which the district judge treated as a motion for a permanent injunction.[2] On appeal, Pure Waters complains that the defendant's environmental assessment and "finding of no significant impact," the so-called FONSI, fail to meet the requirements of both NEPA and MEPA, as well as the water quality standards of the Clean Water Act.
 
 THE NEPA COMPLAINT
 
 8
 Initially, the plaintiff challenges the defendants' failure to file an environmental impact statement evaluating the quality of the water that would result from the six-to-nine discharges of treated sewage into the Rouge River each year, which would occur despite the construction of the basin. Experts for Pure Waters testified, for example, that the chlorine from the disinfection treatment given the overflow would adversely affect water quality. The plaintiff further insists that the defendants' plan to install the equipment necessary to deal with such problems during the monitoring period required in Phase III of the project is inadequate, citing district court decisions from New Mexico, New Hampshire, and New York.
 
 
 9
 But, as the district judge noted in his opinion, the plaintiff's real complaint seems to be that the city commission failed to adopt what Pure Waters sees as the better alternative to the Linden Park basin project--one which, the plaintiff insists, would have no adverse effects on water quality because it would eliminate entirely the discharge of sewage, treated and untreated, into the Rouge River. Under this plan, the city would be required to abandon its combined sewer-storm water system and to build a new, separated system, based on one of three designs (1) construction of storm sewers with utilization of existing sanitary sewers, (2) construction of new sanitary sewers with footing drain removal, or (3) construction of sanitary sewers without the footings. The cost of these alternative systems was estimated at amounts up to twice the cost of the basin project, which was pegged at approximately $30 million. Although Pure Waters's actual preference, the third option, would cost only 50 percent more than the basin project (some $45 million), it would require two to three years of construction during which 80 percent of the city's streets would be torn up, the securing of a great many easements to permit the necessary encroachment of construction on private property, the loss of hundreds of trees along the right-of-way, and the construction of a basin almost as large as the one currently under construction.[3] Because of the additional cost and other negative effects that constructing a new sewer system would entail, this alternative was rejected by city officials in favor of the retention basin plan.
 
 
 10
 In a thorough and well-reasoned opinion, the district judge refused to enjoin construction of the basin on the basis of federal law. The court found the public interest in the basin to be substantial, given the public health risk caused by the level of raw sewage pollution then being discharged into the Rouge River; the possible waste of the $1.5 million already spent on basin construction at the time of the hearing on the motion to enjoin; the extensive citizen participation in the basin decision; and the considerable research and planning effort undertaken in designing the project, the strength of the environmental assessment, and the existence of the FONSI--the "finding of no significant impact." The court concluded that the defendants had not violated NEPA because their environmental assessment met the requirements of 42 U.S.C. § 4332(c), they had held public hearings, and they had issued a FONSI.
 
 
 11
 NEPA requires every federal agency to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on ... the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C)(l). Agencies first prepare an "environmental assessment" in order to determine whether the project's effect on the environment will be significant enough to warrant a more detailed "environmental impact statement." 40 C.F.R. § 1501.4(b)-(c) (1995). If the agency decides that an environmental impact statement is unnecessary, then it must prepare a "finding of no significant impact." 40 C.F.R. § 1501.4(e). Courts will overturn an agency decision not to issue an environmental impact statement only if it is found to be arbitrary, capricious, or an abuse of discretion. Crounse Corp. v. I.C.C., 781 F.2d 1176, 1193 (6th Cir.), cert. denied, 479 U.S. 890 (1986). Hence, NEPA is simply an "action-forcing" provision designed to ensure that agencies consider the environmental impact of their decisions. Kleppe v. Sierra Club, 427 U.S. 390, 409 (1976). It requires a court to ensure that an agency has taken a "hard look" at the environmental effects of a planned project, but does not permit it to substitute its own judgment about the consequences of the agency's plan. Id. at 409-10 n. 21.
 
 
 12
 We have recently decided a case similarly involving a challenge to an agency's decision not to issue an environmental impact statement. See Friends of Fiery Gizzard v. Farmers Home Admin., 61 F.3d 501 (6th Cir.1995). In that case, we held that if a project's only significant impacts are beneficial, then an environmental impact statement is unnecessary. Id. at 505. When reviewed under this standard, the district court's opinion here makes out a compelling case supporting the decision not to require the filing of an environmental impact statement prior to the issuance of a permit for the Linden Park basin project. Certainly, we cannot say that the finding of no significant impact was arbitrary or capricious, or that it represents an abuse of discretion.
 
 THE MEPA DECISION
 
 13
 Under Michigan's environmental protection act, M.C.L. §§ 691.1201 et seq., a court may grant relief "[w]hen the plaintiff in the action has made a prima facie showing that the conduct of the defendant has, or is likely to pollute, impair or destroy the air, water, or other natural resources...." M.C.L. § 691.1203(1). The first determination that must be made in a MEPA case, therefore, is whether the plaintiff has presented a prima facie case. In City of Portage v. Kalamazoo County Road Comm'n, 355 N.W.2d 913 (Mich.App.1984), the Michigan Court of Appeals explained that this inquiry is two-fold. First, the court must determine whether a natural resource is involved, a simple inquiry. Second, acknowledging that almost all activity adversely affects natural resources to some degree, the court must ask "whether the impact of the activity on the environment rises to the level of impairment to justify the trial court's injunction." Id. at 915. To make this second determination, "the court should evaluate the environmental situation prior to the proposed action and compare it with the probable condition of the particular environment afterwards." Id. at 915-6.
 
 
 14
 Given this standard, the district court was eminently correct in ruling that the Michigan statute would not be violated in this case. Even though there may be some adverse impact on the Rouge River after the retention basin is put into operation, clearly the pollution situation will be better than it was prior to the construction of the basin. Hence, the district court's decision that the plaintiff had failed to make out a prima facie case and its subsequent denial of an injunction under MEPA was fully justified by the record.
 
 
 15
 We adopt the findings and the rationale of the district court's opinion and AFFIRM the judgment entered by the district court in the defendants' favor.
 
 
 
 *
 The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [2]
 The district court also denied the plaintiff's motion for a stay pending this appeal of the denial of an injunction. As a result, we are informed that construction of the basin is now substantially more than 50 percent complete
 
 
 [3]
 The plaintiff's alternative of choice would require a basin capacity of 4.5 million gallons, as compared to the 5.5 million gallon basin currently under construction. The plaintiff does point out on appeal that a tunnel already constructed would hold the necessary 4.5 million gallon overflow that its alternative would require. Even so, the cost of the proposed alternative would not be reduced because of the tunnel's existence